**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ricky BRYANT, Defendant-Appellant.**

**No. 82–5691.**

United States Court of Appeals,
Sixth Circuit.

Argued July 27, 1983.

Decided Sept. 2, 1983.

Certiorari Denied Jan. 23, 1984.
See 104 S.Ct. 1006.

Ben W. Hooper (argued), court appointed, Newport, Tenn., for defendant-appellant.

John W. Gill, U.S. Atty., Greeneville, Tenn., Guy W. Blackwell, Asst. U.S. Atty., James C. Kilbourne (argued), Jacques B. Gelin, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before KENNEDY and MARTIN, Circuit Judges, and BROWN, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Ricky Bryant appeals convictions on one misdemeanor and two felony counts of purchasing illegally obtained fox pelts, viola-

tions of the Lacey Act Amendments of 1981, 16 U.S.C. § 3371–3378 (1981). Sentence was suspended on each of the three counts and Bryant was placed on five years probation. We affirm.

■ It is illegal to hunt fox in North Carolina without authorization from the North Carolina Wildlife Resources Commission.

### North Carolina Gen.Stat. § 113–291. General restrictions.

Except as specifically permitted in this Subchapter or in regulations made under the authority of this Subchapter, no person may take, possess, buy, sell, or transport any wildlife—whether dead or alive, in whole or in part. Nor may any person take, possess, buy, sell, or transport any nests or eggs of wild birds except as so permitted. No person may take, possess, buy, sell, or transport any wildlife resources, in violation of the regulations of the Wildlife Resources Commission. (1965, c. 957, s. 2; 1979, c. 830, s. 1).

Authorization is evidenced by a tag issued by the Commission and affixed to the fox's carcass or pelt. N.C.Gen.Stat. § 113–291–4(g) (1979). By regulation, North Carolina Administrative Code, Title 15, Section 10B.0402(a), it is

unlawful, to transport or to buy, sell, barter, trade or otherwise transfer possession or ownership of the carcass or pelt of any fur bearing animal or fox without having affixed to such carcass or pelt an individual tag provided by the [Commission]. Each such tag shall bear a serial number and shall indicate the season during which, and the species of animal for which, its use is authorized.

■ The Lacey Act assists the states in enforcing their wildlife protection laws by making it a federal crime "to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any

fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State...." 16 U.S.C. § 3372(a)(2)(A) (1981).[1]

In the fall of 1980, the North Carolina Wildlife Resources Commission and the United States Fish and Wildlife Commission began a joint undercover investigation of resident and nonresident North Carolina fur dealers who were purchasing illegally obtained fur pelts, including red and gray fox. In December of 1981, a Fish and Wildlife undercover agent, posing as a fur buyer, met with Bryant, a Tennessee resident, and others at a private home in North Carolina. In the course of a general discussion about the fur trade, Bryant expressed an interest in purchasing untagged gray fox pelts. Acknowledging that untagged pelts were illegal in North Carolina, Bryant indicated that any purchase he might make would be contingent on delivery of the pelts to Tennessee. There followed two transactions between Bryant and the undercover agents who, posing as fur trappers, drove to Tennessee from North Carolina with untagged pelts for Bryant's purchase. During these transactions, and in tape-recorded telephone conversations prior to the sales, Bryant repeatedly acknowledged the illegal character of the North Carolina pelts. To conceal that fact, he confided to the agents, he would obtain South Carolina tags, tag the furs, and then "you or no one else can prove they are not South Carolina furs." Furthermore, when told by an agent that the Lacey Act prohibited both the transportation and receipt of illegally taken wildlife across state lines, Bryant responded that although he did not have to know where the pelts came from, even if he did know he would "never admit it."

In addition to the two purchases from the undercover agents, Bryant bought twenty-five untagged North Carolina pelts from David Richie, a codefendant who pled guilty

---

1. The original version of section 3372 was enacted in 1969 as 18 U.S.C. § 43(a)(2). Section 43 prohibited transactions in wildlife taken, transported, or sold in violation of any law or regulation of a state or foreign country. In 1981, 18 U.S.C. § 43 was modified and adopted

as part of the Lacey Act Amendments of 1981 and codified at 16 U.S.C. § 3372. *See* Lacey Act, 16 U.S.C. § 701 (enacted 1900). Collectively, those statutes in Title 16 which seek to conserve and restore wildlife and birds in the United States are referred to as the Lacey Act.

to a reduced charge. Evidence of that transaction was obtained from Bryant's business records seized in a search and confirmed by Richie himself testifying at Bryant's trial.

In addition to Richie's testimony, the government's case was supported by the testimony of the several undercover agents involved in the fur sales as well as the four tape-recorded conversations between those agents and the defendant. Bryant's primary defense was that he did not know that purchasing pelts in Tennessee illegally obtained in another state was a crime.

 Here Bryant raises several issues, none of which have merit. First, he argues that it was error for the court to comment upon the application to his case of an exception to the Lacey Act, section 3377(a), before charging the jury on that exception. Section 3377(c) provides:

> The provisions of paragraph (2) of section 3372(a) of this title shall not apply to the interstate shipment or transshipment through . . . a State of any fish or wildlife or plant *legally taken* if the shipment is en route to a State in which the fish or wildlife or plant may be legally possessed.

(emphasis added). Bryant specially requested that the exception be included in the charge to the jury. The court complied, but only after openly expressing doubt as to its applicability. Although Bryant failed to object at trial, he now cites the court's comment as plain error requiring reversal. If error, however, it was harmless.

 Simply put, the instruction should not have been given because there was absolutely no evidence in the record to support its applicability. A defendant is not entitled to an instruction on a defensive theory absent some evidence to support the theory. *See United States v. White,* 671 F.2d 1126, 1131 (8th Cir.1982); *United States v. Dye,* 508 F.2d 1226, 1231 (6th Cir.1974). A charge on the section 3377(a) exception would have been appropriate had there existed at least a factual question as to whether the pelts purchased by Bryant had been "legally taken." Every shred of evidence in the case, however, including

Bryant's own statements at trial and in the recorded telephone conversations, confirmed that the pelts were untagged and thus illegal. Accordingly, the instruction should not have been given. Because the jury could not have found that the exception applied, it follows that error in expressing doubt as to its applicability was at most harmless.

 Bryant next complains of the court's refusal to instruct on the entrapment defense. However, as the court correctly stated in denying the entrapment request, the defense is not available unless a defendant admits each and every element of the crime. *United States v. Mitchell,* 514 F.2d 758, 761 (6th Cir.1975). This Bryant would not do. When carefully questioned by the court on this issue, he repeatedly refused to admit to all elements of the crime. He continues to rely here, as he did in the court below, upon a *mens rea*-related defense. That reliance precludes resort to the entrapment defense.

 In his last argument, Bryant claims that 16 U.S.C. § 3372(a)(2)(A) is unconstitutionally vague and represents an unconstitutional delegation to the States of legislative power reserved to Congress. Bryant's delegation argument was examined by the Third Circuit in *United States v. Molt,* 599 F.2d 1217 (3d Cir.1979), involving a prosecution pursuant to 18 U.S.C. § 43(a)(2). The defendant in Molt was charged with conspiring to smuggle reptiles into the United States. As the Third Circuit succinctly phrased it, the delegation argument is "patently frivolous." 599 F.2d at 1219, n. 1. The court explained:

> The Act does not delegate legislative power to foreign governments, but simply limits the exclusion from the stream of foreign commerce to wildlife unlawfully taken abroad. The illegal taking is simply a fact entering into the description of the contraband article, just as if importations of wine or automobiles were restricted to bottles bearing an official foreign designation of *appellation controllee* or cars bearing indicia of a foreign

safety inspection. Congress could obviously exercise its plenary power over foreign commerce in such a manner if it so chose.

*Id.* (citations omitted). Although the issue here concerns wildlife taken in violation of state, not foreign laws, the Third Circuit's reasoning disposes of both situations with equal facility.

 Bryant's void for vagueness claim is no more compelling. To invalidate this statute, we would have to conclude that it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. *See Bouie v. Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); *Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). While it may be true, as Bryant repeatedly implies was his situation, that one who does not read the statute can not understand its proscriptions, it does not follow from that irrelevancy that to its readers of ordinary intelligence, it fails to give notice of prohibited conduct. Nor is it rendered unconstitutional by the fact that it, unlike many other federal laws, requires of a person a knowledge of underlying statutes. Although as a result of its dependence on state law, the scope of section 3372 will vary with the "mere whim" of fifty state legislatures, as long as the underlying state crimes are clearly defined, the statute as a whole withstands attack. We think section 103.0402(a), *supra,* the pertinent North Carolina regulatory provision, precisely and unambiguously delineates the elementary notion that dealing in untagged pelts is illegal in North Carolina.

The judgment is affirmed.