UNITED STATES of America, Plaintiff,

v.

**2,507 LIVE CANARY WINGED PARAKEETS (BROTOGERIS VERSICOLORUS), Defendant.**

No. 86–0334–CIV.

United States District Court,
S.D. Florida,
Miami Division.

May 17, 1988.

Peter Prieto and Robyn J. Hermann, Asst. U.S. Attys., Miami, Fla., and S. Jonathan Blackmer, Atty., Dept. of Justice, Washington, D.C., for plaintiff U.S.

Pamela Hornett Kyle, Miami, Fla., and Paul H. Bass, Coral Gables, Fla., for defendant.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPELLMAN, District Judge.

### I. Introduction

#### A. *Nature of Action*

This civil *in rem* forfeiture action was tried by the Court without a jury on Sep-

tember 14, 15 and 29, 1987. Through this action, Plaintiff United States of America (hereinafter referred to as "Plaintiff") seeks to forfeit approximately 2,507 canary-winged parakeets, known by their scientific name of *brotogeris versicolorus.* Specifically, Plaintiff seeks to forfeit the Defendant parakeets on the ground that they were imported in violation of Peruvian law and consequently, in violation of the Lacey Act, 16 U.S.C. section 3372(a)(2)(A). Plaintiff additionally asserts that the parakeets are subject to forfeiture under the Endangered Species Act, 16 U.S.C. section 1538(c)(1), because the permit used to import them was not a valid foreign export permit. 50 C.F.R. section 23.1 (implementing Convention on International Trade in Endangered Species [hereinafter referred to as "CITES"]) and section 23.12 (requiring the issuance of a valid permit for importation of "Appendix II" species, including *brotogeris versicolorus*); *see also* CITES Article VI(2)(b) (determination by a country's designated authority that the issuance of a particular CITES permit does not contravene that country's wildlife protection laws is a prerequisite to the issuance of the permit). The shipment of *brotogeris versicolorus* was imported from Peru into the United States by Claimant Pet Farm, Inc. (hereinafter referred to as "Claimant"). This Court has subject matter jurisdiction of this action under 28 U.S.C. sections 1345 and 1355.

#### B. *Trial Testimony and Evidence*

Plaintiff United States presented its case in chief through the testimony of three witnesses: Director Marco Romero Pastor ("Pastor"), Special Agent Manellio Medina ("Agent Medina"), and Dr. Donald F. Bruning ("Dr. Bruning").

Director Pastor has been with Peru's Ministry of Agriculture since 1973, and since September of 1985 has been the Director of the Department of Forest and Fauna at the Ministry of Agriculture. As the Director of this department, Director Pastor testified that one of his responsibili-

ties is to interpret, enforce and apply the wildlife laws of Peru.

Pastor testified that the laws of Peru, specifically Supreme Decree No. 934–73–AG (hereinafter referred to as "the decree"), prohibit, *from anywhere in the national territory,* the exportation of wild life animals coming from Peru's forest region. A copy and translation of this decree was admitted into evidence as Government's Exhibit 5. Pastor further testified that the species of parakeets known scientifically as *brotogeris versicolorus* comes from the forest or jungle region of Peru, and consequently, under the decree, could not be lawfully exported from Peru.

Pastor testified that wildlife covered by the decree could be lawfully exported from Peru only if there was a properly issued ministerial order authorizing their export for either scientific investigation or for cultural diffusion. Pastor, however, testified that there had been no such authorization in the department files.

Pastor also provided testimony concerning the permit used to import the parakeets. Specifically, Pastor testified that a Director such as himself could not, merely by signing a CITES permit absent a properly issued ministerial decree, authorize the export of a species prohibited from exportation under Supreme Decree No. 934–73–AG. He further testified that the Claimant's CITES permit was not issued according to Peruvian practice because it had not been signed by the shipper: "it is not signed. And according to our norms, this has to be signed upon being delivered." Trial Transcript at 62.

Agent Medina, a Special Agent for the Fish and Wildlife Service, testified concerning the seizure of the parakeets. Agent Medina testified that his first involvement with the parakeets began on April 18, 1985, when he was given information by Special Agent Frank Shoemaker, also an agent with the Fish and Wildlife Service in Washington, D.C., on a shipment from Peru of approximately 3,000 parakeets. Agent Medina was specifically informed that the Peruvian Management Authority had issued an export permit for approximately 3,000 parakeets of one species. The officials from Peru, however, had information that the exporter would be exporting 3,000 parakeets of a different species. During this initial conversation, Agent Medina was also told that the importer of the parakeets was Pet Farm, Inc., the Claimant. After receiving this information, Agent Medina located the permit and discovered that the birds were in a quarantine station.

During a second conversation with Agent Shoemaker, Agent Medina was informed that the *brotogeris versicolorus* could not be exported from Peru. A letter subsequently received by Agent Medina from government officials in Peru confirmed the basis for this conversation. Government Exhibit 13. On April 29, 1985, after having confirmed that the parakeets imported were in fact *brotogeris versicolorus,* Agent Medina and other agents from the Fish and Wildlife Service seized the Defendant parakeets.

Plaintiff also presented expert testimony on the range and habitat of the species *brotogeris versicolorus.* The expert testimony was presented by Dr. Bruning. Dr. Bruning is the curator of the New York Zoological Society and Chairman of the Parrot Specialist Group of the International Council on Bird Preservation. After being qualified as an expert on the range and habitat of the *brotogeris versicolorus,* Dr. Bruning testified that in Peru, the *brotogeris versicolorus* is found only in the Amazon region or tropical forest region of Peru. Finally, Dr. Bruning testified that they were not found in the Piura or Chiclayo regions of Peru or in the northwestern coastal area of Peru.

Claimant presented its case through the testimony of Miguel Cespedes ("Cespedes") and Dr. Bernard Levine ("Levine"). Cespedes was the Peruvian animal shipper who arranged first to have the parakeets captured, and subsequently to have them exported from Peru. He offered no testimony that he had any sort of legal training generally, or regarding matters of wildlife shipment. Rather, he testified that in January of 1985, Armando Pimentel Bustamante ("Pimentel"), Director of Forest and

Fauna at the time the Defendant parakeets were exported from Peru, told him that specimens of *brotogeris versicolorus* had been found in northern Peru. According to Cespedes, Pimentel showed him a paper confirming this and indicating that a regional official "wanted to get rid of the [*brotogeris versicolorus*] because they were causing problems." Trial Transcript at 238. Cespedes subsequently admitted that this "paper" (Government Exhibit 4) was merely a *request* that the parakeets be exported, and not an authorization to export.

After this conversation with Pimentel, Cespedes testified that he contacted Levine, the president of the Claimant company, and told him about the possibility of importing the *brotogeris versicolorus*. Cespedes testified that Levine, on behalf of the Claimant, agreed to purchase the parakeets but only after Cespedes assured him that there would be no legal problems. He testified that he then had several hunters in Peru capture the parakeets and transport the birds to his farm in Peru. According to his testimony, the birds were captured in northwestern Peru, which is separated from the jungle region by the Andes mountain chain, although Cespedes did not travel with the hunters while they were capturing the birds.

Cespedes testified that after the requisite number of parakeets had been captured, he went to the Ministry of Agriculture to process the paperwork needed to export the parakeets from Peru and to obtain a CITES permit. According to Cespedes, his permit request stated only the genus of the birds sought to be exported, "*brotogeris*," but not the species. He further testified that when he went to pick up the paperwork two days later, the CITES permit had been issued for the export of *brotogeris pyrrhopterus*, and not *brotogeris versicolorus*.

Cespedes testified that after he noted the problem with the permit, he went to see Pimentel. According to Cespedes, he told Pimentel about the problem with the permit and Pimentel replied that there was "no problem," that he could change the

permit to read *brotogeris versicolorus.* Cespedes then testified that Pimentel took the original of the CITES permit, typed in the change and initialed it. Cespedes finally testified that on March 29, 1985, he placed the parakeets on a cargo plane and shipped them to the United States.

Cespedes testified that he knew up until January of 1985, that the species *brotogeris versicolorus* could not be exported from Peru. He testified, however, that he was under the impression that Pimentel as the Director of the Department of Forest and Fauna could authorize their exportation despite his knowledge of the preexisting prohibition.

The second witness who testified on behalf of Claimant Pet Farm, Inc., was Dr. Levine. Levine is the president of the Claimant. He testified that the Claimant has about forty (40) employees. During his deposition taken before trial, Levine testified that the Claimant is a major importer of wildlife. *See* Deposition of Bernard Levine at 15 (admitted into evidence as Government Exhibit 19). During trial, Levine testified that in 1985 alone, the Claimant imported at least 42,000 animals. Levine, a licensed veterinarian, testified that he has attended three of the total of five CITES conventions that had been held to date. He further testified that importers, such as the Claimant, rely on suppliers and shippers "to see to it that the shipments are exported legally from the [foreign] country." *Trial Transcript* at 286. Levine testified that he was concerned about the importation of *brotogeris versicolorus* because they had not "recently been coming out of Peru, and they were not listed as a bird in [19]83 to be shipped out." *Trial Transcript* at 297. Levine also admitted during his testimony, that although he was uncertain as to whether he had ever before imported this species from Peru, this was certainly the first time that the Claimant had done so since at least 1983. *See* Government Exhibit 19.

Levine finally testified that he never consulted with Marshal Meyers, a lawyer who monitors legislation concerning the international shipment of wildlife on a worldwide

basis and who Levine considers a friend. During his pretrial deposition, he testified that he had never consulted with anyone from the United States or any officials from Peru before importing the *brotogeris versicolorus* from Peru.

Based on the trial testimony, the exhibits admitted at trial and the respective credibility of the witnesses as assessed by the Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following Findings of Fact and Conclusions of Law. FED.R.CIV.P. 52(a).

## II. Findings of Fact

1. Claimant has approximately forty employees and considers itself a major importer of wildlife. In 1985 alone, Claimant imported "at least" 42,000 animals into the United States. Claimant's president, Dr. Bernard Levine, is a licensed veterinarian who, through vast experience, exposure, and access, had, or reasonably should have accumulated specialized knowledge as to the requirements, technicalities and proper procedures, legal and otherwise, regarding the importation of endangered and threatened species.

2. On March 29, 1985, Claimant imported into the United States approximately 3,000 parakeets of the species *brotogeris versicolorus* from Peru.

3. In Peru, the species *brotogeris versicolorus* is found only in the forest or jungle region of that country, other than a small colony of the birds (approximately 100 specimens) descended from escaped pet parakeets and living in the Lima area. The birds are not migratory, and do not inhabit the Piura region of Northwestern Peru. The birds are adapted to life in a humid jungle type climate, with abundant trees and vegetation. The Piura region is ordinarily arid.

4. The CITES permit used to import the shipment of *brotogeris versicolorus* was not signed by the shipper, Mr. Cespedes. The omission of the shipper's signature is in contravention of Peruvian practice in the issuance of CITES permits.

5. The permit was initially issued to export a species of parakeets know as *broto-geris pyrrhopterus*. The CITES permit was subsequently changed or altered to allow the export of the species *brotogeris versicolorus*. Government Exhibit 1. Director Pimentel, was authorized to sign CITES permits, presuming the validity of the permit in all other respects. Pimentel signed the original permit and initialed the subsequent alteration by which the permit was modified to allow for the shipment of *brotogeris versicolorus*.

6. Contrary to normal Peruvian CITES procedure, the onion skin copy of the permit, which is kept in the files of Peru's Department of Forest and Fauna, does not reflect the change or alteration subsequently made and initialed by Pimentel. Pimentel had obtained no ministerial order or other necessary authorization to export from Peru the species *brotogeris versicolorus*. Despite the existence of the applicable Peruvian decree, the Director of Forest and Fauna took no steps to verify that he had legal authority or to obtain authority to sign the CITES permit allowing the exportation from Peru of the *brotogeris versicolorus*.

7. Claimant knew that as late as 1983 the species *brotogeris versicolorus* could not be exported from Peru. Although Levine was uncertain as to whether Claimant had ever before imported this species from Peru, this was certainly the first time that the Claimant had done so since at least 1983.

8. Claimant did not consult with anyone in the United States to determine whether the birds could be lawfully exported from Peru. Government Exhibit 19. Claimant did not consult with any officials from Peru before importing the *brotogeris versicolorus* from that country. *Id.* Claimant relied on the representation of his Peruvian shipper, Miguel Cespedes, as to the legality of the shipment, although, in the past, the Claimant had seen fit to send employees abroad to personally verify the legality of wildlife shipments.

9. Prior to seizing the birds, Fish and Wildlife Agents had information reasonably indicating that the importation of the parakeets was in violation of Peruvian law.

On April 29, 1985, after the shipment of *brotogeris versicolorus* was released from quarantine in the United States, the shipment was seized by agents of the Fish and Wildlife Service.

### III. Conclusions of Law

#### A. *Burden of Proof in Forfeiture Actions*

In forfeiture actions, including those brought under the Endangered Species Act, 16 U.S.C. sections 1531–43, and the Lacey Act, 16 U.S.C. section 3371–78, the United States must first establish probable cause. 16 U.S.C. section 1540(e)(5) (incorporating forfeiture provisions found in customs laws into Endangered Species Act); 16 U.S.C. section 3374(b) (incorporating forfeiture provisions found in customs laws into Lacey Act); *United States v. 3,210 Crusted Sides of Caiman Crocodilus*, 636 F.Supp. 1281, 1281 (S.D.Fla.1986) (Gonzalez, J.); 19 U.S.C. section 1615. "Probable cause is defined as a reasonable ground for belief or guilt supported by less than prima facie proof, but more than mere suspicion." *United States v. One 1983 Homemade Vessel Named Barracuda*, 625 F.Supp. 893, 898 (S.D.Fla.1986) (Spellman, J.). Hearsay is admissible to prove probable cause. *United States v. A Single Family Residence*, 803 F.2d 625, 629 n. 2 (11th Cir.1986) (citing *Bush v. United States*, 389 F.2d 485, 489 (5th Cir.1968)).

Once the United States establishes probable cause, the burden of proof shifts to the claimant to prove a defense to the forfeiture. *United States v. M/V Christy Lee*, 640 F.Supp. 667, 672 (S.D.Fla.1986) (Spellman, J.) (citations omitted). "The claimant must prove a defense by a preponderance of the evidence." *Id.*[1]

#### B. *The Lacey Act*

The Lacey Act, in pertinent part, provides that it is unlawful for any person to import or purchase in interstate or foreign commerce any wildlife transported or sold in violation of any foreign law. 16 U.S.C. section 3372(a)(2)(A). To establish that there was probable cause to believe that the Lacey Act was violated, the United States needed to sufficiently demonstrate at trial that the parakeets, known by their scientific name of *brotogeris versicolorus*, were imported into the United States in violation of the laws of Peru. *United States v. 3,210 Crusted Sides of Caiman Crocodilus*, 636 F.Supp. 1281, 1285–86 (S.D.Fla.1986).

■ The Court finds, as it previously did during trial, that Plaintiff United States established probable cause to believe that the Lacey Act was violated. The testimony at trial established that Peruvian Supreme Decree No. 934–73–AG prohibits from anywhere in the national territory the exportation of wild live animals coming from the forest or jungle region. This was sufficient in and of itself to establish probable cause to believe that the birds had been imported in violation of Peruvian law.

■ It was additionally established both by Pastor and Dr. Bruning, who was qualified as an expert on the range and habitat of the *brotogeris versicolorus*, that this species comes from or is an inhabitant of the forest or jungle region. Although Dr. Bruning had not been to Peru for some time, in his assessment of the range of these birds, he relied upon well known treatises dealing with this subject and upon the statements of other well known academic colleagues specializing in this field who had recently spent significant time in the area studying bird species and habitats in great detail. Although these statements standing alone might not have been admissible, the Court finds that they constituted information of the "type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject ..." FED.R.EVID. 703. Accordingly, Dr. Bruning's testimony is admissible. As an inhabitant of the forest or jungle region,

---

1. A claimant in a civil forfeiture action must also establish an interest in the "seized property sufficient to satisfy the court of his standing as a claimant." *United States v. M/V Christy Lee*, 640 F.Supp. at 672 (citation omitted). Plaintiff United States did not contest the issue of standing. Trial Transcript at 21. The Court, therefore, finds that Claimant Pet Farm, Inc., has the requisite standing.

the *brotogeris versicolorus* comes within the prohibition of Peruvian Supreme Decree No. 934–73–AG.

Claimant Pet Farm, Inc., asserts that probable cause has not been established to believe that the Lacey Act was violated for two main reasons. First, Claimant contends that the shipment of *brotogeris versicolorus* at issue was not found in the forest or jungle region and consequently does not come within the prohibition of the decree. The Court, as it indicated during trial, rejects the Claimant's first contention.

■ By its clear language, Peruvian Supreme Decree No. 934–73–AG prohibits *from anywhere in the national territory* the exportation of wild live animals coming from the forest region. Director Pastor testified that it does not matter where the wildlife is physically found as long as it is considered an inhabitant of the forest or jungle region. Government Exhibit 5. It was additionally established by both Director Pastor and Dr. Bruning, who was qualified as an expert on the range and habitat of the *brotogeris versicolorus*, that the species *brotogeris versicolorus* inhabits forest or jungle regions. As an inhabitant of the forest or jungle region, the *brotogeris versicolorus* comes within the prohibition of the decree.

Critically, if the decree were interpreted to only prohibit the export of wildlife physically found within the forest region, exporters could illegally transport the wildlife from the forest region and subsequently legally export it out of Peru. This would render the decree meaningless and entirely incapable of protecting endangered or threatened Peruvian wildlife. Based on this analysis, the language of the decree and the trial testimony, the court is of the opinion that the decree applies to all wildlife that comes from or inhabits the forest or jungle region of Peru, no matter where the wildlife is physically present at the time of capture or export.

■ The Court also disagrees with the contention of Claimant that there was no violation of Peruvian law because the permit was signed by the Director of the Department of Forest and Fauna. The only witness with personal knowledge on whether a Director would have the authority to export the species *brotogeris versicolorus* by virtue of his signature was Director Pastor, an individual who held the same position as the individual who signed the CITES permit at issue. He testified that a Director would have no such authority. Colorable compliance with the CITES requirements is no defense to the Lacey Act.

Because the shipment contravened the decree, in the absence of a properly issued ministerial order allowing shipment, the exportation of these birds violated Peruvian law. Pastor testified that he was unable to locate any such ministerial order pertaining to the shipment. The Claimant offered no evidence suggesting that such an order had been obtained. The Plaintiff has established, by a preponderance of the evidence, that this shipment was in violation of the Lacey Act.

### C. The Endangered Species Act

The Endangered Species Act provides, in pertinent part, that it is "unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of the Convention on International Trade in Endangered Species." 16 U.S.C. section 1538(c)(1). The federal regulations that implement CITES provide that "in order to import into the United States any wildlife ... listed in Appendix II from any foreign country, a *valid* foreign export permit issued by the country of origin ... must be obtained prior to such importation." 50 C.F.R. section 23.12(a)(2) (emphasis added).

■ The Court finds that there was probable cause to believe the Endangered Species Act was violated. Critically, Pimentel's signature alone was insufficient to render the permit "valid," as contemplated by the ESA. Article VI of the CITES treaty conditions the validity of an export permit on a determination by the Management Authority of the exporting state "that the specimen was not obtained in contravention of the laws of that State for

the protection of fauna and flora ..." CITES Article VI sec. (2)(b). Thus, the issuance of a CITES permit by the proper management authority of an exporting nation must not contravene that nation's wildlife protection laws. Therefore, unless the issuing individual in this case, Pimentel, insured that the permit complied with Peruvian wildlife protection laws, the permit was invalid. *See Rittenberry v. United States Department of Fish and Wildlife,* Inter. Dec., 2 O.R.W. 208g (FWS App. 1980). The Court finds it significant, not only that Pimentel did not have authority under Peruvian law to issue this particular permit, but also that he did not even so inquire, as CITES requires.

■ Moreover, inasmuch as Title 16 U.S. C. section 1538(c)(1) prohibits trading in specimens contrary to the provisions of CITES, the notion that the validity of a CITES permit depends upon its compliance with the wildlife laws of the issuing nation is incorporated by the Endangered Species Act as well. *See* 16 U.S.C. section 1538(c)(1). Therefore, for a permit to be valid within the meaning of this Act, it must be issued by an agent of the exporting country with authority to do so under the laws of his country.

Under Peruvian law, in order to export a species prohibited by the applicable Peruvian Supreme Decree, a ministerial resolution is necessary demonstrating that the purpose of such exportation is the furtherance of scientific study or of cultural diffusion. Inasmuch as no such resolution was issued by the appropriate authorities, the supreme decree prohibiting the export of the species was controlling and any permit purportedly "authorizing" the export of *brotogeris versicolorus* exceeded the Director's authority and was thus, invalid.

The permit suffered from other notable defects as well. It was not signed by the shipper, Cespedes. This omission, according to the testimony, was in contravention of Peruvian practice, which requires that the CITES permit be signed by the shipper. Additionally, the testimony established that the change or alteration made on the original permit—changing the species sought to

be exported from *pyrrhopterus* to *versicolorus*—was not reflected on the onion skin copy kept at the Department of Forest and Fauna in Peru, as was the ordinary practice.

■ Claimant contends that Plaintiff did not establish a violation of the Endangered Species Act because there was no proof that the permit used to import the shipment of *brotogeris versicolorus* was "fraudulently altered." Claimant essentially argues that Plaintiff's proof on the claim under the Endangered Species Act must be limited to proving that the permit was "fraudulently altered." This argument is not well taken. The express language of the Endangered Species Act does not require that the permit be "fraudulently altered." The Act, and the federal regulations that implement it, merely require that it be proven that the permit was not in fact a *"valid* export permit." 16 U.S.C. section 1538(c)(1); 50 C.F.R. section 23.12(a)(2) (emphasis added). Fraudulent execution is merely one way of demonstrating the invalidity of a permit. To require the Plaintiff to prove fraudulent alteration would unjustifiably require the proof of an element not within the explicit language or contemplation of the statute or the implementing regulations.

■ The Court notes that the Plaintiff has effectively demonstrated the invalidity of the Claimant's permit other than by proof of fraudulent alteration. The Claimant did not timely object to testimony by the Plaintiff's witnesses establishing that the permit was invalid on the ground that such testimony was outside the scope of the pleadings. It is well established that an issue arguably not raised in the pleadings may be tried by implied consent when the party which subsequently opposes the introduction of the issue had previously acquiesced by failing to object to evidence relating to that issue on the ground that the evidence is beyond the scope of the pleadings. *See Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 389 (5th Cir. 1984); *Haught v. Maceluch,* 681 F.2d 291, 305 (5th Cir.1982); *Norris v. Bovina Feed-*

*ers, Inc.*, 492 F.2d 502, 505–06 (5th Cir. 1974).

In *Apple Barrel Productions, Inc.*, the plaintiffs "introduced testimony and submitted arguments in opening and closing" in support of a legal theory that plaintiffs had not raised in the pleadings. 730 F.2d at 388–89. The "[d]efendants failed to object or respond to these arguments" and the court found that the issue had been tried by implied consent. *Id.* at 389.

Claimant, like the defendants in *Apple Barrel Productions, Inc.*, failed to object to evidence and testimony establishing that the permit was not a valid foreign export permit. During opening statement, for example, Plaintiff United States stated the following:

> [Director Pastor] will also testify that this permit is invalid. It is invalid because even assuming that the director at that time signed it, he had no authority to sign it. He had no authority for two main reasons: One, the director could not contradict the Supreme Decree which says that this species of birds cannot be exported.
>
> The second reason that he could not authorize such an exportation is because there must be a prior written authorization from Peru that these birds can be exported. There was no such written authorization.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Mr. Prieto: Director Pastor will also testify that usually the procedure that is used to issue original CITES permits is you issue an original and two copies. If there are any modifications or alterations whatsoever, the alterations are not only made—excuse me, the original permit is reissued. The new permit is reissued. And the two copies also contain that change.
>
> In this case, the only document that contains a change of *brotogeris versicolorus* is the original. The files that Director Pastor has seen in the Ministry of Agriculture do not contain that addition. They only contain one species, the species that was initially authorized to be

exported, that is, the *brotogeris pyrrhopterus.*

> He will also testify that the permit was never signed by the shipper, the man wanting to export—

Trial Transcript at 12–13. As a review of the trial transcript unequivocally reveals, Claimant made no objection that this testimony was outside the scope of the pleadings.

Counsel for the Claimant moved for a directed verdict as to the ESA Count at the close of the Plaintiff's case-in-chief, alleging that the Plaintiff had failed to prove that the CITES permit had been fraudulently altered. Although Claimant's counsel expressed doubt that a merely invalid permit, as opposed to a fraudulently altered permit, violated the ESA, the Court is of the opinion that such an equivocal stand at a relatively late juncture in the proceeding did not rise to the level of a cognizable objection to the scope of the proof presented by the Plaintiff as to the issue of validity generally.

Similarly, the Claimant's comment that the Plaintiff was trying to "ambush the Claimant with another new legal theory," was insufficient to constitute an objection. The transcript demonstrates that the statement was uttered in objection to the Plaintiff's characterization of the law, but in no way directed itself to the nature of proof submitted in the Plaintiff's case as it related to the pleadings.

During Director Pastor's direct testimony—testimony that established that the permit was invalid according to Peruvian practice—Claimant made no objection that this testimony was purportedly outside the scope of the pleadings. Although Claimant objected to the form of the question posed during this specific area of Director Pastor's testimony, none of the objections were on the ground that testimony concerning the permit's invalidity, as opposed to its "fraudulent" alteration, was beyond the scope of the pleadings. *See* Trial Transcript at 61, 62 (Mr. Bass: Objection, Judge, are there any problems with the permit. I don't understand what that means.").

Consequently, even assuming arguendo that the issue of the permit's general invalidity, as opposed to its "fraudulent" alteration, was not raised in the pleadings, the issue was tried by implied consent. The Court concludes that the consideration of this issue fairly furthers the merits of this action and in no unjust way prejudices the Claimant's case. Therefore, assuming that this issue had not been properly presented prior to trial, the Court treats the issue as if it had been so raised. *Fed.R.Civ.P.* 15(b).

 Finally, the Court concludes that this issue was in fact, raised prior to trial. In the parties' Bilateral Pretrial Stipulation, under "Issues of Fact Which Remain to be Litigated at Trial," issue number nine is phrased as follows: "Whether the canary winged parakeets *could* be exported from Peru with an export permit." (emphasis added). Certainly, this stipulated issue addresses the question of whether such a permit could possibly be valid regardless of the validity of the signature. Other issues in the stipulation specifically addressed whether the permit had been fraudulently altered.

D. *The Defense of "Innocent Owner"*

Claimant has raised the defense of "innocent owner." By way of this defense, Claimant asserts that it did all it reasonably could to prevent the shipment of *brotogeris versicolorus* from being imported into the United States in violation of Peruvian law. Plaintiff asserts that this defense is not available in forfeiture actions pursuant to the Act. Alternatively, Plaintiff asserts that even if this defense were available, Claimant has failed to establish it by the preponderance of the evidence.

 The Court is of the opinion that the defense of "innocent owner" is not avail-able in actions under the Lacey Act, 16 U.S.C. section 3372(a)(2)(A). Although there appears to be no published decision directly addressing the issue, the legislative history of the applicable amendments of the Lacey Act unequivocally establishes that the defense of "innocent owner" is not available in forfeiture actions of wildlife brought pursuant to this Act:

> Under the current Lacey Act, a violator does not have to forfeit his illegal shipment unless the Government can prove that he knowingly violated the Act or failed to exercise due care. *The strict liability forfeiture section* of these amendments would allow the protection of various species from harmful illegal trade by withdrawing illegal shipments from the marketplace even when the violation itself is inadvertent.

\* \* \* \* \* \*

The Act provides for forfeiture of the fish, wildlife and plants on a *strict liability basis* because the merchandise is, in effect, contraband. The fact that merchandise such as endangered species can be imported under special circumstances for which a federal permit has been does not disqualify it as contraband. Even narcotics, such as heroin, can be imported with the proper permits. Once the government has made a prima facie showing that the shipment is unlawful, a decree of forfeiture must be entered by the court. As noted by the Supreme Court in *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663 [94 S.Ct. 2080, 40 L.Ed.2d 452] (1974), "good faith or innocence on the part of the owner of property subject to seizure is immaterial."

S.REP. No. 97–123, 97th Cong. 1st Sess. 13, *reprinted in* 1981 U.S.CODE CONG. & ADMIN. NEWS 1748, 1760 (footnote omitted) (emphasis added).[2] *But see United States v. 3,210*

---

**2.** In *3,210 Crusted Sides of Caiman Crocodilus,* after finding that the government had sufficiently carried its burden of demonstrating probable cause under CITES and under the Lacey Act to seize illegal reptilian skins, the Court, without addressing whether the "innocent owner" defense was a legally available defense for the claimant as to either or both of the bases for forfeiture. The Court found, however, that based on the evidence presented, the claimants had not established such defense. 636 F.Supp. 1281, 1286–87. This Court does not read that case as authority for the proposition that this defense is available in forfeiture proceedings under the Lacey Act.

Moreover, because this Court has found that with respect to the Lacey Act, Plaintiff has es-

*Crusted Sides of Caiman Crocodilus,* 636 F.Supp. 1281, 1286–87 (S.D.Fla.1986). The legislative history could not be clearer. Moreover, the statute clearly expresses the legislative intent. It states that wildlife imported unlawfully shall be subject to forfeiture "notwithstanding any culpability requirements for civil penalty assessment or criminal prosecution ..." 16 U.S.C. sec. 3374(a)(1). This unambiguously renders the initial forfeiture of wildlife unlawfully imported under this title a matter of strict liability, subject only to the mitigation and remission provision of section 3374(b). *See* S.Rep. No. 97–123, 97th Cong. 1st Sess. 13, *reprinted in* 1981 U.S.Code Cong. & Admin. News 1748, 1760.

■ Even if the "innocent owner" defense were available, the Court finds that the Claimant failed to establish it. To establish this defense, a claimant must establish by the preponderance of the evidence that it did all that was reasonably possible to prevent the unlawful activity. *United States v. M/V Christy Lee,* 640 F.Supp. 667, 672 (S.D.Fla.1986). The claimant must have taken "affirmative action" to prevent the property from being used in contravention of the applicable statute. *See United States v. (1) 30 Foot Morgan,* 597 F.Supp. 589, 591 (M.D.Fla.1984) (citing *United States v. One 1976 Lincoln Mark IV,* 462 F.Supp. 1383, 1391 (W.D.Pa.1979)). What constitutes "reasonable action" necessarily depends on the particular circumstances and knowledge of the claimant. *See* S.Rep. No. 97–123, 97th Cong. 1st Sess. 10, *reprinted in* 1981 U.S.Code Cong. & Admin. News 1748, 1757 (when due care defense is applicable, a higher standard of due care applies to one with special knowledge and experience regarding wildlife importation).

The testimony at trial established that claimant Pet Farm, Inc., took no affirmative action to ensure that the *brotogeris versicolorus* could be lawfully exported from Peru. Claimant, by the admission of its president, Dr. Bernard Levine, a licensed veterinarian, is a major importer of wildlife. *Deposition of Bernard Levine* at 15 (Government Exhibit 19).

He further testified that he owns a magazine called *Pet Business of Florida, Incorporated,* and that he has several shops and offices in the South Florida Area. Moreover, Levine testified that he is a member of "several more" than nine pet-related organizations, including the Audubon Society, the Pet Industry Joint Advisory Council, and the Pet Industry Distributors Association. In the year 1985 alone, Claimant, which specializes in birds and reptiles, imported "at least" 42,000 animals. Levine testified that he had attended three of the five CITES conventions that had been held by the time this matter was tried and that he had dealt with "thousands of shipments" involving CITES permits over the last several years.

Despite its size, its status as a major importer of wildlife, and the extraordinary sophistication and accumulated experience of the Claimant's president regarding CITES permits and other relevant matters concerning pet importation, Claimant never even attempted to independently confirm or verify that the species *brotogeris versicolorus* could be lawfully imported from Peru. Although Levine testified that he had known that this species was previously prohibited for export from Peru, Claimant never consulted anyone in the United States in an attempt to verify whether *brotogeris versicolorus* could be lawfully exported from Peru. Similarly, before importing the birds, Claimant never consulted any official from Peru. Government Exhibit 19.

Claimant essentially contends that it relied on the shipper, Mr. Cespedes, to ensure that the exportation was lawful according to Peruvian law. *Trial Transcript* at 286. The Court finds that "reliance" suggests passivity, and not action. In *United States v. Fifty–Three Eclectus Parrots,* 685 F.2d 1131 (9th Cir.1982), the court held that the defendant parrots were subject to forfeiture under 19 U.S.C. section 1527(b) even "in the absence of culpable disregard of foreign wildlife laws by the owner." *Id.* at

tablished probable cause and the defense of "innocent owner" is not available, the Court

need not consider whether the defense is also unavailable under the Endangered Species Act.

1133. The court, after noting that the statutory language itself contained no "innocent owner" defense, found that the statute placed "upon the owner the affirmative burden of insuring, by the appropriate documentation, that foreign wildlife laws have not been violated." *Id.* at 1134.

██ Claimant's failure to attempt to actively verify or confirm that the species of *brotogeris versicolorus* could be lawfully exported from Peru was magnified by the fact that Levine knew that exportation of the species from Peru had previously been prohibited and that "they were not listed as a bird in [19]83 to be shipped out." *Trial Transcript* at 297. In Levine's deposition, he testified that he was uncertain whether the Claimant had ever imported *brotogeris versicolorus* from Peru. Levine and the Claimant were clearly on notice, at the very least, that situation demanded a reasonable investigation prior to importation. The testimony showed that the Claimant had, in the past, gone to South America to insure the legality of a prospective shipment. The fact that this particular shipment was relatively small does not lessen the Claimant's standard of care (assuming arguendo the relevancy of the standard of care). This factor, however, apparently did figure into the Claimant's decision not to verify the legality of the shipment. That, then, is a risk that the Claimant personally chose to bear as a matter of economics and is not to be shifted to the world's protected animal species. The duty to investigate the legality of a shipment is simply a cost of business that an animal importer assumes upon choosing to enter or remain in this particular business. He cannot avoid the penalty for noncompliance by claiming that compliance was inconvenient or uneconomical.

The Court finds that the Claimant exercised inadequate care in the course of importing these parakeets. Moreover, the Court utterly rejects the Claimant's contention that a major importer of exotic birds and reptiles, highly experienced in dealing with the requirements of foreign wildlife importation laws, could reasonably rely on a foreign businessman with no apparent legal training to "warranty" the legality of the shipment. If a major importer of these animals were able to rely on such an uninformed representation as the basis for retaining possession and distributing endangered or threatened species, these statutes would offer no more than nominal protection to dwindling animal species. Thus, although the "innocent owner" defense is unavailable in a forfeiture action under the Lacey Act, the Court concludes that the Claimant has failed to establish by the preponderance of the evidence that it is an "innocent owner."

IV. Claimant's Other Challenges

██ The Claimant raises several other challenges to the instant forfeiture, none of which this Court finds persuasive. The Claimants contend that because section 3378 of the Lacey Act provides that the Act shall not be construed so as to modify, supersede, or repeal any provision of federal law, that it cannot be found to have complied with the Endangered Species Act while simultaneously being in violation of the Lacey Act. The essence of this argument is that section 3378 stands for the proposition that the Lacey Act cannot prohibit conduct that the Endangered Species Act apparently allowed.

This argument lacks logic. The two acts address separate violations, which may at time overlap. Moreover, as the Court has found, the Claimant has not prevailed on the forfeiture Count under the Endangered Species Act. Therefore, on these facts, there appears to be no inconsistency between the statutes. Finally, Article XIV, section 1(a) of CITES states that the provisions of the treaty do not limit a party's right to impose even stricter trade prohibitions. *See Man Hing Ivory and Imports, Inc. v. Deukmejian,* 702 F.2d 760 (9th Cir. 1983). Thus, to the extent that the Lacey Act Amendments do so, they are entirely consistent with CITES, and thus, with the Endangered Species Act and therefore, do not violate section 3378.

██ Claimant further argues that the Lacey Act is constitutionally infirm for several reasons. First, Claimant contends that the Act unconstitutionally delegates legislative power. This Court disagrees.

*See United States v. Bryant,* 716 F.2d 1091, 1094 (6th Cir.1983); *United States v. Molt,* 599 F.2d 1217, 1219 (3d Cir.1979).

■ Claimant contends that the Act is constitutionally defective for vagueness and lack of notice. This argument is similarly unpersuasive. *See United States v. Bryant,* 716 F.2d 1091, 1094 (6th Cir.1983). In *Bryant,* the Sixth Circuit upheld the Lacey Act over a substantially identical constitutional challenge in the context of a criminal proceeding. Certainly, if the Act has passed constitutional attack in the criminal context, it should certainly withstand the same challenge in a civil context. The Court finds no authority supporting any other challenges to the constitutionality of this statute.

■ Claimant contends that the Plaintiff is estopped from seeking forfeiture of the seized parakeets apparently because the Government could have prevented the shipment from taking place, thereby preventing the violation. The Court finds that even if this defense is available, no testimony was offered at trial demonstrating any affirmative misconduct on the Government's part.

■ The Claimant further objects that the Plaintiff did not comply with FED. R.CIV.P. 44.1, which requires that a party give his adversary reasonable notice of his intent to rely on foreign law. The record clearly demonstrates that the Plaintiff gave more than adequate notice. Despite the Claimant's assertion otherwise, this Rule imposes no other limitations on the Plaintiff's use of foreign law. Moreover, the Court finds that on the basis of the testimony offered, the Plaintiff adequately proved Peruvian law.

■ The Claimant's final argument is that the "act of state" doctrine precludes this Court from scrutinizing whether Pimental had the authority to issue the CITES permit at issue. The doctrine is a prudential limitation on the exercise of jurisdiction designed so as to avoid harming relations with other nations. *See Callejo v.*

*Bancomer, S.A.,* 764 F.2d 1101 (5th Cir. 1985). The purpose of CITES is to further international cooperation in assisting other countries in the enforcement of their wildlife protection laws. Thus, the treaty clearly *requires* member nations to ensure the validity of the exportation of another nation's protected wildlife for that benefit of that nation. The Peruvian authorities, in fact, informed the United States of the invalidity of the permit and requested that the Government take appropriate action upon the arrival of the shipment. *See* Government Exhibit 13; Trial Transcript at 170. Clearly, then, the Act of State doctrine has no prudential application in this case. Additionally, as the Court has previously noted, the validity of a CITES permit is a requirement of the laws of the United States as well. None of the Claimant's arguments are persuasive.

## V. Conclusion

The Court concludes that Plaintiff United States has established that there was probable cause to believe that the Lacey Act, 16 U.S.C. section 3372(a)(2)(A), and the Endangered Species Act, 16 U.S.C. section 1538(c)(1), were violated by the Claimants importation of the Defendant *brotogeris versicolorus* parakeets. Additionally, the Court finds that the Claimant has failed to show by a preponderance of the evidence that the Defendant parakeets are not subject to forfeiture under either or both of these provisions.

Additionally, the Court concludes that the defense of "innocent owner" is not available in a forfeiture action under the Lacey Act. In any event, the Court is of the opinion that even if this defense is available under the Lacey Act or under the Endangered Species Act, the Claimant failed to establish it by a preponderance of the evidence. Accordingly, the *brotogeris versicolorus* parakeets are subject to forfeiture.

ORDERED AND ADJUDGED that a judgment of forfeiture will be entered in

favor of the United States of America.[3]

3. The Plaintiff is hereby directed to prepare and submit to this Court a Final Judgment in conformance with this opinion within 10 days of the date of this opinion.