**UNITED STATES of America, Plaintiff,**

v.

**The PROCEEDS FROM the SALE OF APPROXIMATELY 15,538 PANULIRUS ARGUS LOBSTER TAILS, Defendants.**

**In the Matter of Louis MARTINEZ and Lista Enterprises Seafood, Inc., Appellants/Respondents.**

**Nos. 91–0339–CIV, 92–1586–CIV.**

United States District Court, S.D. Florida, Miami Division.

Aug. 19, 1993.

Robert K. Senior, U.S. Attys. Office, Miami, FL, for plaintiff U.S.

Michael I. Rose, Miami, FL, for claimant Lista Enterprises Seafood Corp.

Karen Antrim Raine, NOAA Regional Counsel, St. Petersburg, FL, for National Oceanic and Atmospheric Admin.

Kevin M. Plunkett, U.S. Dept. of Justice, Environmental and Natural Resource Div., Washington, DC, for U.S. Dept. of Justice.

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGEMENT

EDWARD B. DAVIS, District Judge.

Before this Court in these consolidated cases are cross motions for summary judgment in the first case, and the government's motion for summary judgment in the second.

In the first case, the United States sought civil forfeiture of the proceeds from the sale of several thousand lobster tails seized as imported into the United States in violation of the Lacey Act, 16 U.S.C. § 3371, *et seq.* The Claimant, Lista Enterprises (along with its president, Louis Martinez) filed a motion for summary judgment and attorneys' fees claiming, among other grounds: (1) there was no probable cause to support seizure and forfeiture of the lobster tails at issue, (2) the eleven month delay between the seizure and the institution of civil forfeiture violated due process, and (3) the Claimant was an innocent owner of the lobster tails and therefore, forfeiture was inappropriate. The government responded with its own motion for summary judgment opposing these arguments and claiming that the facts demonstrate, by a preponderance of the evidence, that forfeiture is appropriate.

In the second case, Lista and Martinez seek this Court's review of the imposition $10,000 fine, imposed jointly and severally, after an administrative proceeding arising out of the same facts. They challenge the findings of the administrative judge as unsupported by the evidence and contrary to law. The government responds that the evidence adduced in the administrative hearing amply supports the ALJ's ruling and was well within his discretion, and on these grounds seeks summary judgment upholding the administrative order. Lista and Martinez argue summary judgment is inappropriate because they claim there exist disputed issues of material fact. The Court will review each of these cases in turn.

## BACKGROUND

This case arose out of the seizure of some 15,538 lobster tails of the species *Panulirus argus,* more commonly known as "spiny lobster," imported into the United States by the Claimant Lista Enterprises Seafood, Inc. from the Turks and Caicos Islands, a British territory in the Caribbean. The seized tails were a portion of a shipment which arrived into Ft. Lauderdale on a commercial flight on March 14, 1990. A portion of this shipment, eighty-five (85) cartons weighing 3,400 lbs., was shipped "in bond," and another portion, seventy-eight (78) cartons, was not bonded.

Both groups of lobster tails were subjected to "spot" inspection by officers of the Florida Marine Patrol ("FMP").

Upon visual inspection of a portion of the bonded shipment the FMP officers concluded that some of the lobster tails were undersized and might be in violation of the Lacey Act. They then contacted the National Marine Fisheries Service ("NMFS") to alert that office that further investigation was warranted. The bonded shipment was then detained and put in freezer storage. Five days later, Special Agent Rebecca Stefanescu from NMFS arrived to inspect the lobster tails for compliance with the Lacey Act. The Lacey Act prohibits the importation of fish or wildlife which is taken in violation of foreign law.[1]

Operating under the mistaken belief that Bahamian law provided the relevant guidelines, Special Agent Stefanescu proceeded, with the assistance of two Coast Guardsman, to measure each lobster tail in the shipment because Bahamian law prohibits the possession of lobster tails under six inches. At the conclusion of the measuring process all of the tails had been separated into three groups. Of the entire shipment of approximately 16,000 tails, 460 were found to be six inches in length or longer. That group was returned to Martinez.[2] A small portion of the remaining tails, 2,738, were less than six inches in length but greater than 5½ inches,[3] and 12,800 were less than 5½ inches long. The total number of tails found to be under six inches was 15,538 and all were seized as imported in violation of the Lacey Act.

At some point, either during the measuring process or at its conclusion, Agent Stefanescu became aware that the Turks and Caicos were not a part of the Bahamas and that the relevant law in the Turks and Caicos set a minimum standard in terms of weight rather than length, that standard being 7 ounces. Rather than go back and weigh each tail individually, Agent Stefanescu relied on some conversion tables to translate length to weight and determined, on the basis of these formulae, that the seized tails were all under the 7 ounces minimum required by Turks and Caicos law.[4]

On March 23, 1990, Agent Stefanescu mailed Martinez a Notice of Seizure and proceeded to solicit bids for the seized tails. She retained approximately 140 of the tails as evidence and sold the remainder to the highest bidder for $31,636.95. After the deduction of packing costs, a total of $31,548.87 was deposited into a suspense account pending the outcome of the administrative forfeiture proceeding. Lista and Martinez were also sent a notice of the sale, and a citation for violation of § 3372(a)(2)(A) of the Lacey Act.

On April 2, 1990, Attorney Michael Rose sent a letter to the Southeast Regional Counsel for the National Oceanic and Atmospheric Administration ("NOAA") which administers these forfeitures, contesting the seizure and sale. A little over a month later Mr. Rose submitted a Claim for Seized Property/Restoration of Proceeds and Customs Form 301. On this form Lista Enterprises is listed as the principal, with Luis Martinez signing as its president, and also listing Martinez as the surety for the required bond. The purpose of this form is to allow the claimant to demand referral to the United States Attorney's Office in order to proceed as a contested forfeiture and to avoid summary administrative forfeiture. The NOAA attorney handling the case notified Mr. Rose that this claim could not be referred to the United States Attorney as the claim did not conform to NOAA regulations regarding the posting

---

1. The Lacey Act also prohibits the importation, exportation, transportation, possession, etc. of any wildlife taken "in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law," 16 U.S.C. § 3372(a)(1), or "in violation of any law or regulation of any State...." 16 U.S.C. § 3372(a)(2)(A).

2. Martinez disputes this testimony and testified at the administrative proceeding that he never received any tails back from Agent Stefanescu. (Hearing Tr. at 295–96). However, the fate of the these 460 tails is not relevant to the current dispute.

3. Apparently, 5½ inches is the Florida legal limit and that was Agent Stefanescu's motivation for segregating this group.

4. Indeed, given the results from the conversion calculations, some of the tails which were returned to Martinez may have also been underweight.

of a bond because Martinez could not, under the regulations, act as his own surety. *See* 15 C.F.R. 904.504(b)(3)(ii) and 31 U.S.C. §§ 9304–9306.

A Summary Declaration of Forfeiture was entered on May 22, 1990. Nevertheless, NOAA again contacted Mr. Rose and outlined the acceptable bonding procedures and communicated to him that he would be given additional time to comply, at which time the Summary Order would be rescinded. Mr. Rose was informed that should his clients fail to comply with the appropriate procedures within this time frame then the Summary Declaration would remain the final agency action.

On June 12, 1990 Mr. Rose sent a letter to the NOAA attorney asking NOAA to waive the bond requirement claiming that his client could not post the bond. However, once again, Martinez failed to submit the necessary documentation to support waiver of the bond requirement, *see* 15 C.F.R. 904.-504(b)(3)(v), and waiver was denied. Then, after the case was reassigned at NOAA to Staff Attorney William J. Nielander, the agency reversed itself, granting the remission of the administrative forfeiture, notwithstanding the failure to post a bond, and forwarded the case to the United States Attorney's Office in late August of 1990. An investigation was officially opened by that Office on September 25, 1990 and the instant complaint in the first case was filed in February of 1991.

As to the administrative citation, Lista Enterprises and Martinez requested a hearing on the matter and this request was granted. A full evidentiary hearing was held on February 5, 1991 before Administrative Law ("ALJ") Judge Hugh J. Dolan. At this hearing Lista and Martinez were permitted to present evidence and cross examine witnesses for NOAA. At the conclusion of the hearing the ALJ found both in violation of the statute and upheld the $10,000 fine imposed by NOAA.

## DISCUSSION

### A. Forfeiture Under the Lacey Act

#### (1) Probable Cause

■ At the outset the Court notes that the burden on the government to establish probable cause for seizure and forfeiture is not a difficult one to satisfy. "Probable cause is defined as a reasonable ground for belief of guilt, supported by less than prima facie proof, but more than a mere suspicion." *United States v. A Single Family Residence*, 803 F.2d 625, 628 (11th Cir.1986) (citations and internal quotations omitted). "The existence of probable cause is judged not with clinical detachment but with a common sense view to the realities of normal life." *Id.* (citations and internal quotations omitted). *See also United States v. 3,210 Crusted Sides of Caiman Crocodilus Yacare*, 636 F.Supp. 1281, 1284 (S.D.Fla.1986) (Gonzalez, J.) (reciting "less than prima facie, more than mere suspicion" standard).

In its argument that the seizure here was not supported by probable cause, the Claimant Lista relies primarily on the fact that the lobster tails were not *individually* weighed.[5] (Cl.'s Mot.Summ.J. at 4, 6). From this fact Claimant appears to reason that Agent Stefanescu's use of conversion tables for length to weight represented an impermissible interpretation or "construction" of the Turks and Caicos law that legal size could be determined by this method as opposed to individual weighing. Claimant then goes on to devote the entirety of its legal argument on this point to why such "construction" is inappropriate because the Turks and Caicos law is unambiguous and thus not susceptible to interpretation or construction.

This argument demonstrates more nimbleness of mind than factual substance. The law of the Turks and Caicos is apparently completely silent as to the appropriate methodology for determining whether lobster tails

---

5. Claimant does not assert that Agent Stefanescu was motivated by any bad faith or malice in employing the measuring versus the weighing method. *Cf. United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1983) (establishing good faith exception to warrant requirement of 4th amendment and contrasting that to situations in which officer's actions were objectively unreasonable or motivated by bad faith or malice).

are in fact in compliance with the law.[6] The Claimant does not cite to this Court any portion of the law which provides for a specific methodology for determining legal size, although the Claimant did submit evidence that in practice individual weighing is employed. Nevertheless, this practice is not determinative of the question of whether or not it was reasonable for Agent Stefanescu to use the conversion tables for length to weight. The answer to that question depends, in turn, upon the accuracy of this method and the probability that Agent Stefanescu's determination that the seized lobster tails were underweight was an accurate one.

This question can best be answered by approaching the problem from the opposite direction, without reference to the conversion tables. Viewed from this perspective it will clear that there was sufficient probability that these lobster tails were *in fact* underweight to satisfy the probable cause standard. The total number of lobster tails seized was approximately 15,400 tails.[7] Their total combined weight was 3,229 pounds. If one multiplies 3,229 times the number of ounces in a pound (16) and then divides this figure by the number of lobsters seized, one arrives at an average weight per lobster of 3.35 ounces. This means that the average weight was half the legal size.

Given the number of tails seized, in conjunction with the total weight, it appears to the Court to have been mathematically impossible for there to have been any significant portion of these tails to weigh seven ounces or more, since for every tail one assumes weighs more than the average of 3.35 ounces, there must be others that weigh less. Moreover, each tail was individually measured and the vast majority found to be under 5½ inches. This fact reduces significantly the probability that there were many large tails included in the seized shipment.

This evidence supports and corroborates that submitted by the Government's expert and the conversion tables relied upon by Agent Stefanescu. According to the unrebutted testimony of the Government's expert, relying on the conversion tables he prepared, a 6 inch tail would weigh 5.28 ounces fresh and 5.195 ounces frozen. (Hearing Tr. at 203). A tail weighing 7 ounces would be over 6½ inches in length. (*Id.* at 204). Thus, some of the tails returned to Martinez may have also been underweight because Agent Stefanescu was under the impression that six inch tails would be legal and she made no record of the individual lengths of those which were 6 inches or longer. If even some of those tails which were returned to Martinez may have been underweight, it seems unlikely that any of the smaller ones could have been seven ounces or more.

The Claimant does not address any of these facts, preferring, as indicated above, to rely on a legal argument that the use of conversion tables constituted an improper "construction" of the Turks and Caicos law. Considering the probable cause standard applicable to this proceeding, the Court finds that the total weight and total number of tails establish beyond reasonable dispute that probable cause existed for seizure and Claimant's argument to the contrary is simply without merit.

*(2) Undue Delay*

The lobster tails were seized on March 19, 1990 and the Declaration of Summary Forfeiture issued on May 22, 1990. Thus, the delay between the seizure and the *administrative* forfeiture was approximately two months. However, the agency, NOAA, eventually remitted this forfeiture and referred the case to the United States Attorney's Office. The delay between seizure and the filing of a forfeiture complaint in District Court was approximately eleven months. It is clear from the case law that eleven months

---

6. The law in question is the "Fisheries Protection Regulations of 1989" which reads in relevant part:

> Any person who takes or is in possession of or sells any marine product smaller than the legal size shall be guilty of an offence....

*Id.* § 14(1).

"Legal size" is defined in § 14(2)(a)(ii) as seven ounces.

7. There is some confusion surrounding the precise number retained for evidentiary purposes. The Court therefore will give the Claimant the benefit of the smaller number.

does not *per se* constitute an unconstitutional delay. *United States v. $8,850.00,* 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983) (18 month delay between seizure and forfeiture held not unconstitutional). Rather, the law requires an inquiry into a number of factors, on a case by case basis, to determine whether a delay is unconstitutionally long. *Id.* at 564–65, 103 S.Ct. at 2012 (applying 4-pronged *Barker v. Wingo* speedy trial test to deprivations of property).

■ There are four factors to be considered: the length of the delay, the reason for the delay, whether the defendant (or in this case the claimant) has asserted his rights, and whether the delay has prejudiced the claimant's ability to present his case. *United States v. $8,850,* 461 U.S. at 564, 103 S.Ct. at 2012. There is no question in the Court's mind that eleven months is a "significant" period to be deprived of one's property. *Id.* at 565, 103 S.Ct. at 2012. However, the Court finds no evidence that the Government's delay in filing this action was motivated by any improper purpose or was the result of any lack of diligence. Moreover, although the Claimant did promptly file a claim asserting its rights and interests in the property, the Court finds that Claimant was primarily responsible for any delay because it did not accompany its claim with the posting of an appropriate bond.

■ Pursuant to NOAA regulations the filing of a satisfactory bond is a prerequisite to transmittal to the District Court. 15 C.F.R. § 904.504(b)(3)(ii), (iv). Failing the posting of a bond, the property is subject to summary forfeiture. 15 C.F.R. § 904.-504(b)(5). The Claimant does not assert that it did not have notice of the seizure, the proposed administrative forfeiture, or the necessary procedures. *See* 15 C.F.R. § 904.-504(b)(2). Indeed, the evidence reflects that the Claimant maintained a lively correspon-

dence on this issue with NOAA in which it argued with NOAA's "interpretation" of what these procedures required.[8] The Court does not find that the regulations in question are so opaque that they require much interpretation in order to comply. But were this even the case, the agency's interpretation of its own regulations is entitled to a high degree of deference. *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986) ("an agency's construction of its own regulations is entitled to substantial deference").

In this case, NOAA ultimately decided to remit the administrative forfeiture and refer the matter to the United States Attorney's office. "Remission or mitigation of a forfeiture is in the nature of executive clemency and is granted in the sole discretion of NOAA only when consistent with the purposes of the particular statute involved and this section." 15 C.F.R. § 904.506(a)(3). Here NOAA exercised its discretion to Claimant's *benefit* by offering it a second chance to contest the forfeiture. However, it was under no legal or constitutional obligation to do so because of the Claimant's failure to post the bond. It seems impossible to avoid the conclusion that the delay which resulted from granting a remission that the Claimant requested cannot be the basis for a constitutional challenge.

### (3) "Innocent Owner" Defense

■ The Lacey Act, under which the government seeks forfeiture here, does not provide for an innocent owner defense. Section 3374(a)(1) provides:

All fish, or wildlife or plants imported, exported, transported, sold received, acquired, or purchased contrary to the provisions of section 3372 of this title (other than section 3372(b) of this title), or any regulation issued pursuant thereto, shall

---

**8.** Claimant's specific quarrel with the procedure was NOAA's refusal to accept Lista as a surety on its own bond. If Lista could not obtain a bond from an independent surety it could hardly argue that its resources were sufficient for it to act as a surety on its own behalf. Conversely, if it had sufficient assets to act as a surety it would not seem unreasonable for NOAA to request it obtain a bond from a disinterested source as, by defini-

tion, a surety should not be an interested party. The Claimant's dispute over the "interpretation" of these requirements is even more puzzling in light of its later attempt to get the bond requirement waived by claiming that it had insufficient resources to post a bond. If the Claimant had insufficient resources to post a bond it hardly seems capable of acting as a surety for the same amount.

be subject to forfeiture to the United States *notwithstanding any culpability requirements for civil penalty assessment or criminal prosecution included in section 3373 of this title.*

*Id.* (emphasis added). The language of the statute unambiguously establishes forfeiture on a strict liability basis. *See United States v. 2,507 Live Canary Winged Parakeets,* 689 F.Supp. 1106, 1117 (S.D.Fla.1988) (Spellman, J.). This conclusion is fully supported by the legislative history. "The Act provides for forfeiture of the fish, wildlife and plants on a *strict liability* basis because the merchandise is, in effect, contraband." *Id.* (emphasis in original) (citing S.REP. NO. 97–123, 97th Cong. 1st Sess. 13, *reprinted in* 1981 U.S.C.C.A.N. 1748, 1760); *see also United States v. One Afghan Urial Ovis Orientalis Blanfordi Fully Mounted Sheep,* 964 F.2d 474, 476 (5th Cir.1992) (per curiam) (no innocent owner defense to forfeiture under the Lacey Act).

In its motion the Claimant does not acknowledge the above authority. Instead, without providing any factual or relevant[9] legal support, it relies on naked assertions that it was without knowledge of any violation and did everything possible to prevent such a violation of the law. (Cl.'s Mot. Summ.J. at 10). The language Claimant uses stems from the *Calero–Toledo* case in the United States Supreme Court. *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 668, 94 S.Ct. 2080, 2084, 40 L.Ed.2d 452 (1973). That case involved a forfeiture under the drug laws.

Although the drug forfeiture statute now provides for an innocent owner defense, *see*

*supra* note 9, the language of which tracks the *Calero–Toledo* decision, that defense was not available at the time the case was decided. Therefore, it is unclear whether, under some circumstances, the constitutional argument asserted by the Claimant *might* be applicable, even to forfeitures pursuant to strict liability statutes, and the Court is not prepared to say that no constitutional challenge could *ever* be raised to forfeiture under this section. Nevertheless, the Claimant offers no facts that suggest this argument ought to be considered in this case.

Moreover, this is not a case where forfeiture is sought on the basis of some sort of "taint" theory by virtue of the property's connection with a contraband substance, or use for some illegal purpose. *Cf. Calero–Toledo,* 416 U.S. at 693, 94 S.Ct. at 2096–97 ($20,000 yacht forfeited on the basis of the presence of two marijuana cigarettes) (Douglas, J., dissenting). Cases such as *Calero–Toledo,* which do not involve forfeiture of contraband *per se,* present a different problem from the instant case. In such cases the connection between the offense and the forfeiture may be attenuated. The more attenuated the forfeiture from the violation of the law in question, the more serious the constitutional ramifications of strict liability become in light of the government's diminished burden in civil forfeiture cases.[10] Here, however, the lobster tails were themselves contraband and therefore their forfeiture falls into the strictly remedial category of forfeitures. *See, e.g., One Lot of Emerald Cut Stones v. United States,* 409 U.S. 232, 237, 93 S.Ct. 489, 493, 34 L.Ed.2d 438 (1972) (per

---

9. The Claimant cites only one case in support of its argument, *United States v. 4,657 Acres in Martin County, Fla., ("Tucker"),* 730 F.Supp. 423 (S.D.Fla.1989) (Davis, J.). This case is inapposite to the instant case in that *Tucker* involved a forfeiture pursuant to 21 U.S.C. § 881(a)(7), a statute which includes an innocent owner defense. *Tucker,* 730 F.Supp. at 425–26. As previously discussed, there is no such innocent owner defense to a forfeiture under 16 U.S.C. § 3374(a)(1).

10. One of the most constitutionally suspect aspects of forfeiture proceeding from a taint theory is that, until recently, the degree of the forfeiture did not need to bear any proportional relationship to the crime. *See United States v. One 1982*

*28' Int'l Vessel,* 741 F.2d 1319 (11th Cir.1984) (boat forfeited on the basis of a "twig and a leaf"). However, the Supreme Court has recently held that the 8th Amendment imposes some proportionality limitation on civil forfeitures. *Austin v. United States,* — U.S. —, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). Because forfeiture under § 3373(a)(1) is limited to the illegally imported contraband itself, and does not authorize, for example, forfeiture of those lobster tails which were of legal size merely because they were shipped together with some which were undersized, this Court has no difficulty concluding that it survives any new proportionality test imposed by *Austin.*

curiam). Thus, for all of the foregoing reasons, the Court rejects Claimant's "innocent owner" defense and will grant the United States' motion for Summary Judgment.

## B. Review of $10,000 Administrative Fine

### (1) Standard of Review

The second case before this Court, Lista and Martinez's dispute of the fine imposed upon them in the administrative proceeding, is in the nature of an appeal of that ruling. Appeals of such decisions are subject to de novo review in the district court as provided for by 16 U.S.C. § 3373(c). The issue is whether the imposition of the penalty is supported by substantial evidence. *See Hale v. Bowen*, 831 F.2d 1007, 1010 (11th Cir.1987). *See also Newell v. Baldridge*, 548 F.Supp. 39, 45 (W.D.Washington 1982) (finding of willful violation of Lacey Act and imposition of fine supported by substantial evidence). In reviewing the evidence under this standard the Court finds it appropriate to rely on the record from the administrative proceeding as the Plaintiffs do not assert that they would testify any differently to this Court. *Newell*, 548 F.Supp. at 44.[11]

■ The section of the Lacey Act under which Lista and Martinez were fined is 16 U.S.C. § 3373(a)(1) which provides that anyone who knowingly imports fish or wildlife covered by the statute, and taken in violation of foreign law, may be assessed a penalty of up to $10,000 per violation. In this case "knowingly" includes situations where the violator knew or should have known "in the exercise of due care" that the fish or wildlife was taken in violation of the law. 16 U.S.C. § 3373(a)(1). Given the findings in the first case, the only real issue is whether the evidence adduced in the administrative proceeding supports a conclusion that Martinez, and by extension Lista, knew or should have known that these lobster tails were underweight in violation of the law of the Turks and Caicos.[12]

### (2) Review of the Evidence

■ Initially, several undisputed facts are relevant. First, Martinez appears to be the sole employee of Lista. Martinez testified that he runs the business himself from his house. (Hearing Tr. at 275). Second, he testifies that he has been doing this business for "years." (*Id.* at 281–82, 293). Third, Martinez testified that he personally was present in South Caicos when he purchased these lobster tails and when some of them were packed for shipment. (*Id.* at 292–94).

One of the most important pieces of evidence going to the issue of knowledge is the testimony of Coast Guardsman Norman McLeod, Jr. Guardsman McLeod testified that the lobster tails at issue here "were the smallest lobster tails I have seen in 11 years ... when I was unpacking them, I would open up a box and there would be like a top layer of 5½ to 6 inch tails. Under that, there would be 30 to 40 3 inch tails." (*Id.* at 64; *see also id.* at 317).

Guardsman McLeod also testified that Martinez came to the warehouse while the measuring process was underway and that he seemed very agitated and argued with Agent Stefanescu that she could not inspect the "in bond" portion of the shipment. (*Id.* at 307). He reports that Martinez said, "I brought it in bond so you would not go into it...." (*Id.*) This testimony was corroborated by the direct examination of Martinez by his lawyer. Question by Mr. Rose:

> So that I understand, you bring it [some shipments] in bond so that Customs does not hold up the product here [so you can

**11.** Unlike in *Newell* the Plaintiffs do assert that they did not receive a full and fair hearing as they dispute numerous evidentiary rulings by the Administrative Law Judge. *See* Response to Defendant/Appellee NOAA's Motion For Summary Judgment at 5. Upon review of the record this Court finds these allegations to be without merit.

**12.** The Plaintiffs object to numerous legal conclusions by the ALJ including: (1) whether spiny lobster is a "migratory species" and therefore subject to an exclusion under the Lacey Act; (2) whether there is an exception for transshipments under the Act; (3) the proper interpretation of the Turks and Caicos law; (4) whether there was sufficient evidence to establish an agency relationship between Martinez and Lista; and (5) whether the penalty amount was excessive. The Court finds these arguments are without merit on the facts of this case.

sell it right away] as opposed to having the product brought in, left here for Customs to review it, inspect it and then bring it to your place and sell it to some place else?

Answer:

And pay for freezer here.

(Hearing Tr. at 287).

Although Martinez's answer is not directly responsive to the question, taken in context it reveals his acquiescence to this characterization of his state of mind or motivation. This evidence suggests both that there was an attempt to disguise the undersized lobsters and that Martinez hoped to avoid discovery by shipping the undersized lobsters in bond.

Given the undisputed facts that Martinez was solely responsible for the business activities of Lista, that he personally purchased the lobster tails at issue and saw at least some of them being packed, and that he has been in this business for years, the Court finds that the evidence amply supports Martinez's liability for the violation claimed. Martinez's liability applies by extension to Lista of which he is the President.

Therefore, it is

ORDERED AND ADJUDGED that The United States Motion for Summary Judgment in Case no. 91–0339 and NOAA's Motion for Summary Judgment in Case no. 91–1586 are GRANTED. Within ten (10) days of the date stamped on this order, the United States and NOAA shall submit proposed forms of final judgment.

DONE AND ORDERED.