**UNITED STATES of America, Plaintiff,**

v.

**ONE HANDBAG OF CROCODILUS SPECIES and Two Handbags of Caiman Crocodilus Yacare, Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**THIRTY–FIVE HANDBAGS OF CAIMAN CROCODILUS YACARE and One Handbag of Melanosuchus Niger, Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**THIRTEEN HANDBAGS OF CAIMAN CROCODILUS YACARE; Two Caiman Crocodilus Yacare Belts; One Handbag of Crocodilus Species and Alligator Mississippiensis; and Two Handbags of Varanus Species, Defendants.**

Nos. 91–CV–2982 (DRH), 90–CV–0836 (DRH), and 92–CV–4338 (DRH).

United States District Court,
E.D. New York,
Hauppauge Division.

June 25, 1994.

Zachary W. Carter by Gary R. Brown, Shari D. Leventhal, Asst. U.S. Attys., U.S. Atty., E.D.N.Y., Brooklyn, NY, for plaintiff.

Soller, Shayne & Horn, J.S. Suarez Inc. by Carl R. Soller, Ellen L. Federman, Margaret H. Sachter, New York City, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HURLEY, District Judge.

## NATURE OF PROCEEDING

The United States seeks forfeiture of each of the seized defendant properties listed in the three captioned actions, which total fifty-seven items. The plaintiff seeks forfeiture of these items under Section 11(e)(4)(A) of the Endangered Species Act, 16 U.S.C. § 1540(e)(4)(A).[1]

Plaintiff contends that defendant products are subject to forfeiture because they were manufactured from hides of crocodilians designated as endangered under the Endangered Species Act and/or because the items were improperly identified on their relevant Convention on International Trade in Endangered Species ("CITES") importation certificates.

The claimant, J.S. Suarez, Inc., imported, and claims ownership of the defendant properties. As such, it seeks their return, arguing that forfeiture does not properly lie because of, *inter alia,* due process violations and plaintiff's failure to establish grounds for forfeiture. More particularly, the claimant has framed six issues for the Court's consideration, the resolution of which, it maintains, requires that the seized items be returned to the claimant. Those six issues are set forth on page 19 of claimant's post-trial Memorandum of Law, and are as follows:

1. Is the identification of products alleged to be made from caiman crocodilus yacare ("yacare") too uncertain to constitute notice of the violation adequate for due process?

---

1. In the third of these three consolidated actions, plaintiff also sought forfeiture of these items pursuant to the Lacey Act, 16 U.S.C. § 1374(a)(1). However, plaintiff chose not to litigate the Lacey Act claim at trial.

2. Did the delays that preceded initiation of the forfeiture action violate due process?

3. Did the government lack probable cause to seize this merchandise?

4. Did the government fail to demonstrate probable cause for forfeiture of this merchandise?

5. Did the Claimant prove by a preponderance of evidence of geographical origin that the merchandise was not made from the subspecies yacare?

6. In the alternative, if the merchandise is subject to forfeiture, did the Claimant establish a good-faith defense?

## TRIAL TESTIMONY

By way of a brief synopsis, the following testimony was presented to the Court during the course of the non-jury consolidated trial:

1. *Testimony of John Meehan.*

John Meehan, a Special Agent of the United States Fish and Wildlife Service ("USFWS") testified that the defendant products were detained by USFWS inspectors and, following their examination by Peter Brazaitis, ultimately seized, based on the belief that they had been imported in violation of CITES and/or the Endangered Species Act.

2. *Testimony of Peter Brazaitis.*

Mr. Brazaitis testified as a herpetologist, i.e., a specialist in the study of reptiles and amphibians. His specific field of expertise is the identification of crocodilians. At the request of the USFWS, he examined the products which Special Agent Meehan had ordered detained, and determined that fifty-two were manufactured, at least in part, from skins taken from yacare, an endangered crocodilian subspecies. In addition, he identified one item as having been manufactured from the endangered black caiman, and found that four others were improperly identified in their CITES permits.

With respect to Mr. Brazaitis, I found him to be a credible witness. He testified in considerable detail that certain distinguishing characteristics of the various crocodile sub-

species survive the tanning and finishing process, including the shape and pattern of the skin scales, the presence or absence of keeling, and the number of tail inclusions. Such characteristics, if viewed individually rather than cumulatively, are not "fail safe" methods of identification of a particular subspecies, because of a partial overlap of these characteristics between and among the subspecies. However, it should be emphasized that such overlaps are typically only partial, and, therefore, the combination of certain characteristics may greatly enhance the identification process. By way of example, in caiman crocodilus ("crocodilus") and caiman crocodilus fuscus ("fuscus") two non-endangered subspecies of crocodilians, it is atypical to see either chain pattern flank rows or multiple tail inclusions, and it is highly improbable that either subspecies would possess both characteristics, whereas both are commonly seen in the endangered subspecies yacare.

By analyzing the total number of various characteristics and their combinations within a given defendant product, the witness was able to identify, in a manner in which the Court found highly credible, the type of disputed skin or skins used to manufacture the product in question.

3. *Testimony of Doctor Robert Madden.*

Doctor Madden testified as an expert witness on the use of statistical methods to resolve disputes in biology. Using data supplied by Mr. Brazaitis, Doctor Madden performed a statistical analysis to determine whether certain scale characteristics could provide a suitable basis for identifying whether a given product was manufactured solely from crocodilus or fuscus skins or whether the product contained any yacare skins. His analysis focused on five scale characteristics, viz. the arrangement of flank rows, the number of unkeeled flank rows, the number of tail inclusions, the number of flank rows that have elongated scales, and the total number of flank rows. Via this method, he determined whether the items listed on their CITES permits as either fuscus or crocodilus were correctly identified. Illustrative of the methodology used is the analysis of the de-

fendant product that was marked as Exhibit 5(a)(2). Claimant identified that product as "fuscus". Yet it contained, as explained by Mr. Brazaitis, "chain pattern rows" and three "tail inclusions" together with one "elongated scale row". That combination of skin characteristics, according to the testimony of Doctor Madden, creates a "zero" statistical probability that the skin used to manufacture Exhibit 5(a)(2) is fuscus, as claimed in its CITES document. *See* Exhibit PX–18, entitled "Summary of Yacare Identification Characteristics and Statistical Correlation".

4. *Testimony of Doctor Wayne King.*

Doctor Wayne King was called as the claimant's expert on crocodilian identification. The thrust of his testimony was that for a number of reasons, including the fact that the defendant products were in a finished state, it was not possible to identify the majority of the defendants by subspecies. That being the case, in Doctor King's view, plaintiff cannot legitimately claim that the defendant property is subject to forfeiture as being made from the skins of endangered species or because of incorrect CITES identifications.

The Court had an opportunity to listen to the testimony of Doctor King and Mr. Brazaitis. Each had impressive credentials. However, Mr. Brazaitis was considerably more knowledgeable concerning recent developments in the field of reptile and amphibian identification. Accordingly, I accept Mr. Brazaitis' testimony, and conclude that the plaintiff, using current identification methods, was able to, and did in fact, properly identify the skins used in the manufacture of the defendant products. Those skins were taken from endangered species and/or were incorrectly identified in CITES documents.

5. *Testimony of Joseph Suarez.*

Mr. Suarez testified as the president of the claimant J.S. Suarez, Inc. One-third of the corporation's business involves reptile skins and approximately ninety-eight percent of its merchandise is imported from Italy.

J.S. Suarez's primary supplier of caiman products is Franco Parmigiani, with whom Mr. Suarez has enjoyed a long business rela-

tionship. Mr. Suarez indicated that he relied on Mr. Parmigiani to make sure that the skins shipped to this country were in conformity with law and properly identified. He acknowledged that it was his obligation, as the importer, to have proper CITES documentation, although, given the logistics involved, he relied on his supplier. He further testified that although he previously answered certain interrogatories by indicating that he would not pay for the seized merchandise unless and until it was released by the government, that he had, in fact, paid for and was the owner of the defendant products.

## DISCUSSION

By way of format the Court will discuss, *ad seriatim,* each of the issues raised by the claimant.

### *DUE PROCESS CLAIMS:*

#### 1. INABILITY TO IDENTIFY YACARE

The claimant maintains that the forfeiture of his merchandise for allegedly containing yacare is a denial of due process, because that subspecies of caiman is not identifiable with reasonable certainty.

The Court has already rejected, at least in part, the premises for the present argument by concluding that an expert is capable of identifying products made of yacare with reasonable certainty. However, there are apparently a limited number of such experts, and it may well be that businesspersons in the trade rarely possess the requisite expertise.

Presumably this problem is not limited to commerce in certain caiman skins. Difficulty in identification of many endangered species is to be expected due to the rarity of the product involved, coupled with the fact that trade in the product is prohibited. Such being the case, it appears that few persons would have had an opportunity to gain familiarity with the animal. The situation is further complicated when the endangered wildlife is, as in the present case, but one of a number of subspecies which share similar

physical characteristics, so that only experts can draw critical distinctions.

Does such difficulty in identification render enforcement of the Endangered Species Act, and concomitant forfeiture actions, violative of the due process clause of the 5th amendment? In this Court's view, the answer to that question is "no". Initially, it should be noted that if the claimant's argument was accepted, it would be virtually impossible to protect endangered species; paradoxically, the degree of difficulty typically would escalate as the number of a protected species in existence declined.

■ Moreover, and by way of analogy, in the criminal law there are certain crimes that are *malum prohibitum*. In such instances, society has decided that the legislative goal sought to be realized outweighs the unfairness that might befall an individual who unintentionally violates the law. Similarly, those who traffic in products involving endangered species run the risk of having the product forfeited, even if compliance with the law is sometimes difficult because of identification problems. *See United States v. 1,000 Raw Skins of Caiman Crocodilus Yacare*, No. CV–88–3476, 1991 WL 41774, at *6–7 (E.D.N.Y. Mar. 14, 1991) ("[W]here an importer knows in advance that importing certain skins is prohibited, he can engage in his 'own inquiry' to determine the nature of the skins. Such inquiry may be difficult and expensive; however, this alone does not render the statute [unconstitutionally] vague.") (citing *Hoffman Estates v. Flipside*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1981)). Whether the rationale for this result is based upon the fact that the target of the action is the *res*, and not the person having an interest in the *res*, or whether it is based upon a balancing of the competing interests involved, the result is the same.

In sum, this Court rejects the argument that the identification difficulties associated with yacare render the statutory scheme to protect such animals unconstitutional as violative of due process.

## 2. DELAY IN INITIATING FORFEITURE PROCEEDING

■ The second part of the claimant's due process claim hinges on the delay that pre-ceded the initiation of the forfeiture proceeding, and is two pronged: (1) failure to comply with statutory directives requiring the expeditious prosecution of forfeiture cases; and (2) excessive delays between the seizures and the commencement of forfeiture actions.

In *United States v. James Daniel Good Real Property*, —– U.S. —–, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), the Supreme Court held that a forfeiture action filed within the five year statute of limitations period could not be dismissed as untimely even if the government breached the timing requirements of 19 U.S.C. §§ 1602–1604. That holding invalidates claimant's statutory non-compliance argument, as acknowledged in the following excerpt from the December 27, 1993 letter of claimant's attorneys to the Court: "the claimant's statutory objection would appear to be foreclosed by the recent Supreme Court decision [in *Good Real Property* ]".

The *Good Real Property* decision did not address Claimant's constitutional objection to the delay. However, a perusal of the facts in this case, viewed in conjunction with the analysis set forth in *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850.00) in U.S. Currency*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983), indicates that the delay in this case was not constitutionally inordinate. In the *$8,850* case, the Supreme Court explained that, to determine whether a delay in a forfeiture case has abridged a claimant's constitutional rights, courts must balance four factors: the length of the delay, the reason for the delay, the claimant's assertion of his or her right to the property, and the prejudice to the claimant. *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). Further, the Court noted that "none of these factors is a necessary or sufficient condition for finding unreasonable delay. Rather, these elements are guides in balancing the interests of the claimant and the Government...." *Id.*, 461 U.S. at 565, 103 S.Ct. at 2012.

In light of this standard, the record reveals that the plaintiff has asserted, and the claim-

ant has not disputed, that administrative forfeiture proceedings were commenced within five months of each of the seizures at issue. When claimant elected to proceed judicially by filing a claim and cost bond, the cases were filed in the District Court with reasonable dispatch. One case was filed within one month of receipt of claimant's claim and cost bond, another was filed within five months, and the third within ten months. The Court accepts the government's representation that the time that elapsed between seizure and commencement of the administrative proceedings was due to routine investigatory procedures, and there is no indication that the government engaged in dilatory tactics or was less than diligent in pursuing these actions. *See id.* at 566–67, 103 S.Ct. at 2013–14. No steps were taken by the claimant to accelerate the process, such as by filing an equitable action seeking an order compelling the filing of the forfeiture action, or by making a motion for return of the seized property. *See United States v. Eight Hundred Seventy Four Thousand Nine Hundred and Thirty Eight Dollars ($874,938.00) in U.S. Currency,* 999 F.2d 1323, 1325 (9th Cir.1993). Moreover, the claimant has not established, or even alleged, that its ability to defend this action on the merits was compromised by delay. Under the four-part balancing test enunciated in the *$8,850* case, the Court finds that the delays between the seizures and the commencement of the forfeiture actions do not constitute a denial of the claimant's right to due process of law.

### PROBABLE CAUSE FOR THE SEIZURE, AND FORFEITURE OF THE DEFENDANT ITEMS

 Claimant contends that the defendant items should not be subject to forfeiture because the initial seizure of the property was made without probable cause. First, it should be noted that a claimant may challenge the initial seizure *prior* to trial pursuant to Local Admiralty Rule 12, or by making a motion for the return of seized property. Neither application was made by the claimant in this case. Assuming that the issue of the legality of the initial seizure is properly before this Court, the Court notes that the observations made by the inspectors

prior to the detention of the items, coupled with the analysis of the property made by Mr. Brazaitis shortly thereafter, arguably established probable cause for the seizure. However, that issue need not be resolved, for even if, *arguendo,* the initial seizure of the property was illegal, that does not immunize the property from forfeiture. *See, e.g., United States v. Daccarett,* 6 F.3d 37 (2d Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1294, 127 L.Ed.2d 648 (1994); *United States v. $37,780 in U.S. Currency,* 920 F.2d 159, 163 (2d Cir.1990); *United States v. Real Property Known as 77 East 3rd Street, New York, New York,* No. 85 Civ. 3351, 1994 WL 4276, at *4 (S.D.N.Y. Jan. 4, 1994) ("[B]oth the unconstitutionality of the seizure and any procedural defects in the warrants themselves, do not affect the court's jurisdiction over the property in the forfeiture proceeding.... The property ... remains subject to forfeiture so long as the Government establishes probable cause....").

At the trial, the government met its initial burden of establishing probable cause for instituting the forfeiture proceedings, by showing "reasonable ground[s] for [the] belief [that the property was subject to forfeiture] ..., supported by less than *prima facie* proof but more than mere suspicion". *United States v. One 1978 Chevrolet Impala,* 614 F.2d 983 (5th Cir.1980). The burden then shifted to the claimant to demonstrate, by a preponderance of the evidence, that the properties are not subject to forfeiture. In an unsuccessful effort to accomplish that task, the claimant relied primarily on Doctor King. He testified that four of the defendant's handbags were clearly misidentified on the relevant CITES documents and that, in fact, with respect to two of these handbags, the violations were blatant. As to the remaining fifty-three items, he testified he was not able to identify the subspecies of crocodilian that was embodied in the product, nor, in his judgment, could anyone else, including the plaintiff.

The argument that no one could identify the disputed skins was not convincing. Moreover, the government called Mr. Brazaitis and Doctor Madden in rebuttal. Their testimony further established that the defen-

dant properties are subject to forfeiture, as being either manufactured in whole or part from the skins of endangered species, or for being incorrectly identified in their CITES documents.

## INNOCENT OWNERSHIP DEFENSE

■ Claimant argues that he is an "innocent owner", thereby insulating his merchandise from forfeiture. Having reviewed the respective positions of the parties, however, as well as the relevant case law, the Court concludes that a good faith defense is not available in a forfeiture proceeding based on violations of the Endangered Species Act. As one court has persuasively explained,

> [T]he application of strict liability in wildlife forfeiture actions is necessary to effect Congressional intent. To permit an importer to recover the property because he or she lacks culpability would lend support to the continued commercial traffic of the forbidden wildlife. Additionally, a foreseeable consequence would be to discourage diligent inquiry by the importer, allowing him or her to plead ignorance in the face of an import violation. Furthermore, it is not unreasonable to expect the importer to protect his or her interest by placing the risk of non-compliance on the supplier in negotiating the sales agreement.

*United States v. 1,000 Raw Skins of Caiman Crocodilus Yacare*, No. CV–88–3476, 1991 WL 41774, at *4 (E.D.N.Y. Mar. 14, 1991) (citing *United States v. Fifty–Three Eclectus Parrots*, 685 F.2d 1131 (9th Cir.1982)); *see also United States v. 2,507 Live Canary Winged Parakeets*, 689 F.Supp. 1106, 1117 (S.D.Fla.1988) ("The Court is of the opinion that the defense of 'innocent owner' is not available in actions under the Lacey Act.... The Act provides for forfeiture of the fish, wildlife and plants on a *strict liability basis*, because the merchandise is, in effect, contraband.") (emphasis in original); *United States v. Proceeds From The Sale of Approximately 15,538 Panulirus Argus Lobster Tails*, 834 F.Supp. 385 (S.D.Fla.1993). *But see United States v. 3,210 Crusted Sides of Caiman Crocodilus Yacare*, 636 F.Supp. 1281, 1286–87 (S.D.Fla.1986) (court assumed, without analysis, that an innocent owner defense was avail-

able in wildlife forfeiture proceeding, but held that defense was unavailable to claimant in that case); *Carpenter v. Andrus*, 485 F.Supp. 320 (D.Del.1980) (where owner did not intend to ship leopard hide to United States, but shipping agent accidentally brought the hide into the country, court held that owner was wholly innocent of wrongdoing and denied government's forfeiture application).

Moreover, the Court notes that, as a forfeiture proceeding under the Endangered Species Act, the present case is not one in which some type of nexus has to be established between the property subject to forfeiture and the conduct sought to be controlled, such as those instances in which the government seeks to have currency forfeited as traceable to illegal trafficking in narcotics. Here, the two items are the same: the endangered species is the contraband. Under such circumstances, and given the language of the relevant statutes and the rationale underlying their enactment, a "good faith" or "innocent purchaser" defense is not available in the present case.

■ Even if, *arguendo*, a claimant's non-culpability is a defense, it should be noted that the Court has significant reservations about Mr. Suarez's innocence. On several prior occasions, he and the same supplier imported products into the United States, including yacare, in violation of the Endangered Species Act. (Tr. at 45.) Given the previous illegality, claimant may not close his eyes to the likelihood of a repeat occurrence. Simply relying on that supplier for compliance with the law, as Mr. Suarez testified he did, is not sufficient to trigger a good faith defense, assuming that such a defense exists in this type of forfeiture proceeding.

## CONCLUSION

The above constitutes the Court's Findings and Fact and Conclusions of Law.

ORDERED AND ADJUDGED that a Judgment of Forfeiture is entered in favor of the plaintiff, the United States of America, for the entire amount of the *res*. The plaintiff shall submit, on notice, within ten (10)

days of the filing of this order, a proposed final judgment of forfeiture.

SO ORDERED.