**CASTLEWOOD PRODUCTS,
et al., Plaintiffs,**

v.

**Gale A. NORTON, in her official capacity as Secretary of the U.S. Department of the Interior, et al., Defendants.**

**No. C.A. NO. 02–1457 (TPJ).**

United States District Court,
District of Columbia.

April 16, 2003.

James Taylor Banks, Patrick D. Traylor, Hogan & Hartson, L.L.P., Washington, DC, for Castlewood Products, L.L.C, Interforest Corp., M. Bohlke Veneer Corp., Marwood Inc., United Veneer L.L.C., Veneer Technologies, Aljoma Lumber Inc, plaintiffs.

Serrin Turner, U.S. Department of Justice, Washington, DC, Arthur Robert Goldberg, U.S. Department of Justice, Carole Annette Jeandheur, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Gale A. Norton, In her official capacity as Secretary of U.S. Department of Interior, Department of Interior, Steven A. Williams, In his official capacity as Director of the United States Fish and Wildlife Service, Ann M. Veneman, In her official capacity as Secretary of the United States Department of Agriculture, Department of Agriculture, Craig A. Reed, In his official capacity as Administrator of the United States Animal and Plant Health Inspection Service, United States Animal and Plant Health Inspection Service, United States of America, U.S. Fish and Wildlife Service, federal defendants.

William John Snape, III, William Carroll Muffett, Karena Crocker Anderson, Washington, DC, for Defenders of Wildlife, Greenpeace, Inc., Natural Resources Defense. Center for International Environment Law.

James Bryan Dougherty, Washington, DC, for National Wildlife Federation.

### MEMORANDUM AND ORDER

JACKSON, District Judge.

Since July, 1975, the importation of certain species of endangered flora and fauna into the Unites States from abroad has been governed by the Convention on International Trade in Endangered Species ("CITES" or the "Convention"), March 3, 1973, 27 U.S.T. 1087, and the implementing statute, the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1544 (the "ESA"). One such species of flora is the bigleaf mahogany tree from Brazil.

Article V of CITES governs "trade in specimens of species" included in Appendix III, the appendix listing the bigleaf ma-

hogany tree.[1] Article V provides in pertinent part that export of any Appendix III specimens "shall require the prior grant and presentation of an export permit" which is to be granted only when a "Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of [its] laws," and shall be admitted to import only upon the "prior presentation of a certificate of origin...and an export permit." CITES Article V(2)-(3).

The "Management Authority" for Brazil under CITES is known by the acronym IBAMA. IBAMA's U.S. counterpart is the U.S. Fish and Wildlife Service ("FWS") of the U.S. Department of the Interior, see 16 U.S.C. § 1537a(a), but the ESA entrusts enforcement of export and import restrictions under CITES to the Secretary of the Department of Agriculture, who has delegated authority to the Animal and Plant Health Inspection Service ("APHIS") of the U.S. Department of Agriculture. See 16 U.S.C. § 1540(h) and 48 Fed.Reg. 54,627 (Dec. 6, 1983).

Between February and July 2002, some 16 shipments of bigleaf mahogany lumber and veneer from Brazil were intercepted by APHIS at their respective ports of entry in the United States and placed in storage in quarantine rather than delivered to the consignees. The reason was suspicion on the part of FWS that the wood may have been harvested after the effective date of a moratorium imposed by the Brazilian government the preceding October on the logging of bigleaf mahogany in that country. FWS had learned of Brazil's moratorium on logging, transport,

and export of bigleaf mahogany timber in late fall, 2001, and made inquires of IBAMA seeking further information. It was informed by IBAMA officials in early winter, 2002, that recent shipments of Brazilian mahogany then beginning to arrive at U.S. ports were accompanied by documents purporting to be export permits issued by IBAMAor, more precisely, by an IBAMA official—but the permits had issued pursuant to *ex parte* orders of a lower Brazilian court and did not reflect IBAMA's independent official judgment, as Brazil's Management Authority, that the mahogany had been obtained lawfully. The court orders, IBAMA reported, had been appealed. One had been reversed and other reversals were expected. IBAMA requested that the U.S. detain the suspect shipments pending clarification. APHIS accordingly began the practice of detaining all such shipments, and this action followed.

Plaintiffs are seven U.S. corporate consignees of the disputed shipments. Plaintiffs commenced this action in July, 2002, for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to compel the immediate unconditional delivery to them of their shipments of bigleaf mahogany allegedly unlawfully detained by order of the defendants. On January 23, 2003, the government entered a Memorandum for the Record, i.e., the administrative record, which represents final agency action in the matter and declares the government's intention to return all shipments of bigleaf mahogany still in detention to Brazil.[2] The case is now ripe for review and

---

1. The signatory states are responsible for designating species for inclusion in the various appendices identifying flora and fauna to be protected under CITES.

2. Since the case was filed, additional shipments of bigleaf mahogany have been de-

tained at their ports of entry, and some (including several of the original 16 shipments) have been released to the consignee. As of the end of January, 2003, ten full and one partial shipment remain "on hold" in detention.

presently before the Court on cross-motions for summary judgment. Plaintiffs make the argument in a variety of familiar APA guises (e.g., the defendants acted arbitrarily and capriciously, did not consider relevant information, failed to articulate a rational basis for their actions, etc.), but the essence of their claim is that defendants acted without lawful authority in summarily seizing, and holding, and ultimately effectively expropriating their property for which they had paid their Brazilian suppliers by sending some of it back to Brazil.

Plaintiffs contend that such authority as FWS and/or APHIS may have with respect to assuring compliance with CITES and the ESA is altogether ministerial: The agencies are limited to ascertaining whether the shipments of bigleaf mahogany are accompanied by facially "valid" export permits, defined as being export permits which have been "issued and signed by [the] managing authority" of the country of origin or export. *See* 50 C.F.R. §§ 23.12(a)(3)(i), 23.14(a). Each of the shipments of bigleaf mahogany in question, they say, is accurately reflected in an accompanying export permit duly "issued and signed" by IBAMA, and neither FWS nor APHIS is empowered to go behind the export permit to verify what it purports to certify, namely, that the lumber was lawfully obtained in the country of origin, nor may they question the authority of the official or officials who caused it to issue.

Article VIII of CITES itself, however, commands the signatory parties to "take measures . . . to provide for the confiscation or return to the State of export" of specimens obtained in violation thereof. *See* CITES Article VIII(1)(b). Moreover, since its ratification, the parties to CITES have adopted "resolutions" thereunder instructing one another to refuse imports of specimens for which there is "reason to believe it was not legally acquired" and to "immediately inform the country whose laws were thought to have been violated . . ." *See* CITES Resolutions 10.2 and 11.3.[3] The U.S. Supreme Court has said "[b]ecause a treaty ratified by the United States is not only the law of this land, see U.S. Const., Art. II, § 2, but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history . . . and the postratification understanding of the contracting parties." *Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). The resolutions clearly evince a "postratification understanding" of the parties to CITES that mutual assistance in the enforcement of their respective environmental laws is expected.

The decision to seize (and *a fortiori* detain) and ultimately to confiscate contraband specimens under the ESA is similarly

---

**3.** CITES Resolution 11.3 recommends that "if an importing country has reason to believe that an Appendix–II or -III species is traded in contravention of the laws of any country involved in the transaction, it: (i) immediately inform the country whose laws were thought to have been violated and, to the extent possible, provide that country with copies of all documentation relating to the transaction; and (ii) where possible, apply stricter domestic measures to that transaction as provided for in Article XIV of the Convention." CITES Resolution 11.3.

Shortly after this lawsuit was filed, CITES Resolution 10.2 was incorporated into a new resolution, CITES Resolution 12.3, which adds a new provision recommending that "the Parties refuse to accept any permit or certificate that is invalid, including authentic documents that do not contain all the required information . . . or that contain information that brings into question the validity of the permit or certificate." CITES Resolution 12.3 § XIV(d).

grounded in clear statutory authority. The ESA explicitly provides the government with the power to seize wildlife and plants shipped in contravention of the Act. "All fish or wildlife or plants taken, possessed, sold, purchased, offered for sale or purchase, transported, delivered, received, carried, shipped, exported, or imported contrary to the provisions of this chapter, any regulation made pursuant thereto, or any permit or certificate issued hereunder shall be subject to forfeiture to the United States." 16 U.S.C. § 1540(e)(4)(A). APHIS's regulations implementing the ESA also authorize the seizure of wildlife and plants shipped in contravention of the ESA. *See* 7 C.F.R. § 356.1

Finally, such case law as there is on the subject supports the government's position that it has authority to decline to accept export permits accompanying endangered specimens from abroad at face value when reason is shown to doubt their validity. In *United States v. 2,507 Live Canary Winged Parakeets (Brotogeris Versicolorus)*, 689 F.Supp. 1106 (S.D.Fla.1988), an exotic bird importer secured a Peruvian export permit for CITES-listed parakeets found only in the Peruvian wild, despite the fact that Peruvian law barred the exportation of live wild animals from Peru's forest region. The district court found that CITES conditions the validity of the export permit on a determination by the Management Authority of the exporting state, "that the specimen was not obtained in contravention of the laws of that state for the protection of flora and fauna," *Id.* at 1114–15, and stated that the permit, was not "valid" because it contravened the issuing nation's wildlife protection laws. *Id.* at 1115.

In *United States v. 1,000 Raw Skins of Caiman Crocodilus Yacare*, 1991 WL 41774, at *1 (E.D.N.Y. Mar.14, 1991), a district court in New York upheld the FWS' seizure of crocodile skins accompanied by an export permit appearing to be facially valid, despite listing a different species and country of origin for the skins than was actually the case. What drew the inspector's attention was what appeared to be fresh blood on the skins, which was inconsistent with the CITES requirement that the skins come from pre-convention stock. *Id.* at *2—4. In *United States v. 3,210 Crusted Sides of Caiman Crocodilus Yacare*, 636 F.Supp. 1281 (S.D.Fla.1986), a district court in Florida found a violation of CITES when an importer presented an unendorsed photocopy of an export permit, rather than an endorsed original, that did not list the full number of skins it accompanied. *Id.* at 1285. What initially drew the inspector's attention was a "suspicious" country listed on the permit as the country of origin. *Id.* at 1283.

Plaintiffs attempt to distinguish these cases, arguing that in each of the above cases the permit in question did not match the shipment it accompanied.[4] The dis-

---

4. In *2,507 Live Canary Winged Parakeets*, 689 F.Supp. at 1110—12, the permit in question was not signed by the shipper, and a change in the species listed on the permit was not changed on the copy held by the exporting country's Management Authority. In *1,000 Raw Skins of Caiman Crocodilus Yacare*, 1991 WL 41774, at *4, the species of the skins listed on the permit did not match the species of the skins imported, and in *3,210 Crusted Sides of Caiman Crocodilus Yacare*, 636 F.Supp. at 1285, the permit in question was a xerox copy of the original and did not list the true number of skins imported.

In this case, plaintiffs claim, the permits presented were facially valid and described the accompanying shipment perfectly. Defendants respond that the export permits at issue here are *not* "facially" valid. Irregularities include a missing endorsement and a stamped *caveat* to the effect that the permit was issued pursuant to a "precarious" judicial order.

tinction is immaterial. In each case, a district court, having been shown good reason why government officials deemed the documentation accompanying a shipment to be suspect, upheld the government's authority to investigate and make its own substantive determination as to the unlawfulness of a shipment tendered for import.

In the instant case, neither the legal provenance of all of the disputed shipments under Brazilian law nor the mystery of origins of the suspect export permits is resolved by the record. In May, 2002, IBAMA informed FWS that because of a judicial injunction it was unable to confirm or deny the legality of specific shipments. It did, however, provide a table listing the amount of lumber shipped by several exporting companies and the amount of that lumber which was officially considered by IBAMA as likely being of legal origin. Following discussions between the U.S. Embassy in Brazil and Brazilian officials it was agreed that APHIS would adopt a "chronological approach" under which the U.S. would allow the release of shipments, in chronological order of shipping, until the total amount released equaled the amount calculated by IBAMA to be within quota. Since July 9, 2002, APHIS has continued to communicate with Brazil and IBAMA, and in every instance in which IBAMA has confirmed the legality of a shipment, APHIS has released that shipment.

Finding that the defendants' actions were in all respects authorized by treaty, statute, and regulation, and that the government did not act arbitrarily, capriciously, nor did it abuse its discretion in the matter, the Court will grant the government's motion for summary judgment.

For the foregoing reasons, it is, therefore, this 16th day of April, 2003,

ORDERED, that defendants' motion for summary judgment is granted, and plaintiffs' motion is denied; and it is

FURTHER ORDERED, that defendants' motion to dismiss is dismissed as moot; and it is

FURTHER ORDERED, that the Clerk of the Court shall forthwith enter final judgment for defendants dismissing the complaint with prejudice.