Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued  March  12,  2004            Decided  April  30,  2004

No. 03-5161

CASTLEWOOD PRODUCTS, L.L.C., ET AL.,
APPELLEES

INTERFOREST CORP., ET AL.,
APPELLANTS

v.

GALE A. NORTON,
IN HER OFFICIAL CAPACITY AS
SECRETARY OF U.S. DEPARTMENT OF INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 02cv01457)

———

*Patrick D. Traylor* argued the cause for appellants.  With him on the briefs was *James T. Banks*.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Charles W. Scarborough*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Roscoe C. Howard, Jr.*, U.S. Attorney, and *Mark B. Stern*, Attorney.

*William J. Snape III* and *William Carroll Muffett* were on the brief for *amici curiae* Defenders of Wildlife, et al. in support of appellees.

Before: EDWARDS and HENDERSON, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: This case concerns the United States' detention of several shipments of bigleaf mahogany from Brazil. The United States and Brazil are both signatories to the Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087 ("CITES" or "Convention"). The Convention governs trade in endangered species that are listed in its appendices. Article V provides that an export permit for species included in Appendix III can be granted by the exporting country only when, *inter alia*, the designated Management Authority of the exporting country is satisfied that the specimen was not obtained in contravention of its laws. CITES, art. V(2)(a), 27 U.S.T. at 1097. Brazil has included bigleaf mahogany in Appendix III. In the United States, the Endangered Species Act, 16 U.S.C. §§ 1531-44 (2000) ("ESA"), prohibits trade in violation of the Convention and authorizes the Secretary of the Interior and the Secretary of Agriculture to enforce the ESA.

This case arose when the Animal and Plant Health Inspection Service ("APHIS") of the United States Department of Agriculture ("USDA") refused entry at U.S. ports to certain shipments of bigleaf mahogany after Brazil's Management Authority gave information to the United States Department of the Interior's Fish and Wildlife Service ("FWS") suggesting that the specimens in the shipments were not legally obtained. On July 23, 2002, Castlewood Products, L.L.C.,

Interforest Corp., M. Bohlke Veneer Corp., Marwood, Inc., United Veneer, L.L.C., Veneer Technologies, Inc., and Aljoma Lumber, Inc., the U.S. corporate consignees of the disputed shipments, brought this action in the United States District Court for the District of Columbia to compel delivery of the shipments. The plaintiffs claimed that, because the export permits accompanying the shipments were signed and issued by Brazil's Management Authority, APHIS's detention of the shipments was arbitrary and capricious. The District Court denied the plaintiffs' motion for summary judgment and granted summary judgment to the Government, holding that the decision to detain the shipments was authorized by treaty, statute, and regulation. *Castlewood Prods. v. Norton*, 264 F. Supp. 2d 9, 14 (D.D.C. 2003). Interforest, Marwood, Veneer Technologies, and Aljoma Lumber appealed and we now affirm the judgment of the District Court.

## I. BACKGROUND

### A. Regulatory Background

The Convention governs the import and export of certain species of endangered fauna and flora that are listed in its appendices. This case concerns bigleaf mahogany, which Brazil has included in Appendix III. Article V of CITES provides that the export of any species listed in Appendix III requires "the prior grant and presentation of an export permit." CITES, art. V(2), 27 U.S.T. at 1097. That article provides:

> An export permit shall only be granted when the following conditions have been met:
>
> (a) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora;
>
> (b) a Management Authority of the State of export is satisfied that any living specimen will be so pre-

> pared and shipped as to minimize the risk of injury, damage to health or cruel treatment.

*Id.*

A Management Authority is designated by each state to "grant permits or certificates on behalf of that Party." *Id.*, art. IX(1)(a), 27 U.S.T. at 1103. The United States has designated the Secretary of the Interior as the CITES Management Authority, and the Secretary's functions in this capacity are carried out through FWS. *See* 16 U.S.C. § 1537a(a). In Brazil, the Instituto Brasileiro do Meio Ambiente e dos Recursos Naturais Renovaveis or the Brazilian Institute of the Environment and Renewable Natural Resources (also known as "IBAMA") is the Management Authority under CITES.

Article VIII of the Convention provides:

> (1) The Parties shall take appropriate measures to enforce the provisions of the present Convention and to prohibit trade in specimens in violation thereof. These shall include measures:
>
> > (a) to penalize trade in, or possession of, such specimens, or both; and
> >
> > (b) to provide for the confiscation or return to the State of export of such specimens.

CITES, art. VIII(1)(a), 27 U.S.T. at 1101. Article XIV makes it clear that the Convention does not purport to limit the right of the Parties to adopt "stricter domestic measures regarding the conditions for trade, taking possession or transport of specimens of species included in Appendices I, II, and III, or complete prohibition thereof. . . ." *Id.*, art. XIV(1)(a), 27 U.S.T. at 1108.

Article XI provides for regular meetings of the Parties to the Convention, at which they may, *inter alia*, "make recommendations for improving the effectiveness of the present Convention." *Id.*, art. XI(3)(e), 27 U.S.T. at 1105. These recommendations, adopted through resolutions, are intended to give guidance to the Parties in implementing the Convention. Since ratification, the Parties have adopted two resolu-

tions recommending specific measures to strengthen enforcement of the Convention. One, Resolution 11.3, recommends that,

> (c) if an importing country has reason to believe that an Appendix-II or -III species is traded in contravention of the laws of any country involved in the transaction, it:
>
>> (i) immediately inform the country whose laws were thought to have been violated and, to the extent possible, provide that country with copies of all documentation relating to the transaction; and
>>
>> (ii) where possible, apply stricter domestic measures to that transaction as provided for in Article XIV of the Convention.

CITES, Resolution 11.3 (2000). The other, Resolution 12.3, recommends that "the Parties refuse to accept any permit or certificate that is invalid, including authentic documents that do not contain all the required information . . . or that contain information that brings into question the validity of the permit or certificate." CITES Resolution 12.3 § XIV(d) (2002) (recalling and incorporating CITES Resolution 10.2 § II(h) (1997)).

Congress implemented the Convention into U.S. law in the Endangered Species Act of 1973, Pub. L. No. 93-205, 87 Stat. 884 (codified as amended at 16 U.S.C. §§ 1531-44 (2000)). The ESA makes it unlawful to "engage in any trade in any specimens contrary to the provisions of the Convention." 16 U.S.C. § 1538(c)(1). It provides that any fish, wildlife or plants possessed or transferred in violation of the ESA or its regulations "shall be subject to forfeiture to the United States." 16 U.S.C. § 1540(e)(4)(A). The Secretary of the Interior is authorized to promulgate regulations as may be appropriate to enforce the ESA. 16 U.S.C. § 1540(f). The statute also provides for the coordination of the administration of the ESA between the Secretary of Agriculture and the Secretary of the Interior. 16 U.S.C. § 1540(h). FWS and APHIS work together to enforce the provisions of CITES.

The Department of the Interior has promulgated regulations to implement the ESA. *See* 50 C.F.R. pt. 23 (2003). One regulation provides: "In order to import into the United States any wildlife or plant listed in appendix III from a foreign country that has listed such animal or plant in appendix III, a valid foreign export permit or re-export certificate issued by such country must be obtained prior to such importation." 50 C.F.R. § 23.12(a)(3)(i). Another regulation states: "Only export permits, re-export certificates, certificates of origin, or other certificates issued and signed by a management authority will be accepted as a valid foreign document from a country that is a party to the Convention." 50 C.F.R. § 23.14(a).

## B. Factual Background

The facts are largely undisputed. In the fall of 2001, FWS and APHIS learned that the Brazilian government had imposed a moratorium on the logging, transport, and export of bigleaf mahogany timber. In February 2002, APHIS placed holds on shipments of bigleaf mahogany from Brazil. FWS sent a letter to IBAMA, noting that "none of the permits accompanying the shipments were endorsed . . . by the export inspection authorities in Brazil," and stating that USDA was detaining the shipments until officials in the United States could gain "verification of the validity of accompanying CITES permits." *See* Letter from Mark Albert, Branch of CITES Operations, FWS, to IBAMA of 2/15/02, Joint Appendix ("J.A.") 203-04. IBAMA informed FWS that recent shipments of bigleaf mahogany arriving in the United States from Brazil were accompanied by export permits that IBAMA had issued pursuant to preliminary judicial injunctions. IBAMA stated that its issuance of these permits did not reflect its independent judgment that the mahogany had been obtained lawfully. *See* Letter from Antonio Carlos R. Lins, Head of International Cooperation, IBAMA, to Dr. Peter O. Thomas, Chief, Division of Management Authority, FWS of 2/21/02, Supplemental Appendix 1-2.

IBAMA informed FWS that it had appealed these decisions, the merits of which were pending. IBAMA pointed out

that one injunction had been reversed, and that it was confident that "in the appeals, the second instance judges will probably follow the same guide, since the injunctions were being provided '*in audita altera parte*' (latin term to express 'without hearing the other part')...." *Id.* at 2. The letter noted that bigleaf mahogany trade had ceased by law in Brazil, with an exception for certified timber. It also acknowledged that bigleaf mahogany continued to be logged illegally. *See id.* FWS and IBAMA had a similar exchange about two other shipments of mahogany in March 2002. *See* Letter from Andrea Gaski, Chief, Branch of CITES Operations, FWS, to IBAMA of 3/12/02, J.A. 212-13; Letter from Aleksandro Cavalcanti Sitonio, Attorney General (Substitute), IBAMA, to Gaski of 3/12/02, J.A. 216-18. FWS then received letters from Randolf Zachow, an IBAMA official, confirming the validity of some of the permits in question, and questioning the validity of the ban on the harvesting of mahogany. Letter from Randolf Zachow, IBAMA, to Gaski of 3/26/02, J.A. 219; Letter from Zachow to Gaski of 4/4/02, J.A. 220; Letter from Zachow to Thomas of 4/25/02, J.A. 222-25.

On May 2, 2002, the President of IBAMA, Rômulo José Fernandes Barreto Mello, sent a letter to FWS invalidating Zachow's statements. Mello informed FWS that Zachow's letters did not express the point of view of the Brazilian government or IBAMA, and that Zachow had since been dismissed from his post. Letter from Mello to Thomas of 5/2/02, J.A. 227-29. Mello's letter also stated that IBAMA's law enforcement officials and technicians would determine the entire wood chain of custody for bigleaf mahogany from the forests and the trading companies in 2000 and 2001. The study would take into account the diminished volume of mahogany resulting from exports prior to the October 2001 ban. This was intended to determine the balance of sawn wood that could have been commercialized after the ban, and would therefore determine how much bigleaf mahogany came from a legal and known origin. *See id.* at 228-29.

In a letter dated May 22, 2002, Mello clarified IBAMA's position regarding the permits issued pursuant to judicial command. He wrote that IBAMA "must not say that a

judicial decision is not legal or not valid." Letter from Mello to Thomas of 5/22/02, J.A. 234. Mello stated further that "it has never been mentioned that CITES permits were not legal or not valid." *Id.* However, Mello also noted that "the controls available nowadays at IBAMA do not allow us to state exactly the legality of each particular shipment." *Id.* at 235. The letter provided survey data indicating that shipments of mahogany up to a certain volume had legal origin, but that "the legal origin of such exceeding volume is not confirmed by IBAMA, as required in Article V, paragraph 2(a) of the Convention." *Id.*, J.A. 236.

Subsequently, IBAMA presented tables to the CITES Secretariat showing the total volume of legally harvested timber by exporter. *See* Letter from Mello to John M. Sellar, Senior Enforcement Officer, CITES Secretariat of 6/3/02, J.A. 238-42. On June 20, 2002, APHIS released five shipments of bigleaf mahogany for which IBAMA had identified the origin and chain of custody. *See* APHIS News, USDA Releases Hold on Selected Bigleaf Mahogany From Brazil (June 20, 2002), J.A. 245. However, APHIS continued to detain other shipments of bigleaf mahogany.

On July 23, 2002, the plaintiffs commenced this action in the United States District Court for the District of Columbia to compel the delivery of the mahogany shipments that were still being detained. They filed a complaint for injunctive and declaratory relief against APHIS, FWS, Gale A. Norton, in her official capacity as the Secretary of the Interior, Steven A. Williams, in his official capacity as the Director of FWS, Ann M. Veneman, in her official capacity as the Secretary of Agriculture, and Craig A. Reed, in his official capacity as Administrator of APHIS. The plaintiffs argued that, pursuant to the ESA and its implementing regulations, APHIS is required to validate a shipment for import upon presentment of all documentation required by the implementing regulations, and that a valid foreign export permit is the only document from the exporting country that is required under the Convention. *See* Compl. for Injunctive and Declaratory Relief ¶ ¶ 41-42, J.A. 23-24.

On January 23, 2003, APHIS entered a Memorandum for the Record "to document the decision of the U.S. Department of Agriculture (USDA) to refuse entry into the United States of certain shipments of bigleaf mahogany lumber and veneers that the Convention on International Trade in Endangered Species (CITES) management authority of Brazil (known as IBAMA) has been unable to confirm originated from legal sources." USDA, Memorandum for the Record, January 23, 2003, at 1, J.A. 291. The memorandum stated:

> IBAMA confirmed that although it had issued the CITES export permits for the shipments, it had done so under court injunctions which it was appealing. IBAMA indicated it had not determined whether the mahogany had been legally acquired, which is a prerequisite to the issuance of a CITES export permit for this species. For that reason, APHIS has held those and subsequent mahogany shipments imported into the United States in order to determine from IBAMA if the mahogany was legally acquired.

*Id.* The memorandum explained APHIS's position that, since it had the express authority to seize and forfeit articles traded in violation of the CITES treaty, it also had the discretion to choose a less drastic action, such as to refuse entry to a commodity. It pointed out that its action complied with CITES Resolution 10.2 § II(h), which recommended that the signatories "not authorize the import of any specimen if they have reason to believe that it was not legally acquired in the country of origin." *See* USDA, Memorandum for the Record, January 23, 2003, at 3, J.A. 293 (quoting CITES Resolution 10.2 § II(h) (1997) (recalled and incorporated into CITES Resolution 12.3 (2002)).

The parties then filed cross-motions for summary judgment in the District Court. The District Court determined that the decision to seize, detain, and confiscate contraband specimens under the ESA was within the agency's clear statutory and regulatory authority. *Castlewood Prods.,* 264 F. Supp. 2d at 12-13. Based on the record before it, the District Court

found that APHIS and Brazilian officials had agreed to adopt a "chronological approach," under which the United States would allow the release of shipments in chronological order of shipping, until the total amount released equaled the amount calculated by IBAMA to be of legal origin. It noted that, "in every instance in which IBAMA has confirmed the legality of a shipment, APHIS has released that shipment." *Id.* at 14. The District Court concluded that "the defendants' actions were in all respects authorized by treaty, statute, and regulation, and that the government did not act arbitrarily, capriciously, nor did it abuse its discretion in the matter." *Id.* at 14. It therefore granted the Government's motion for summary judgment. *Id.*

Four of the plaintiffs now appeal the District Court's judgment denying their motion for summary judgment and awarding summary judgment to the Government.

## II. ANALYSIS

### A. Standard of Review

We review *de novo* the District Court's grant of summary judgment, which means that we review the agency's decision on our own. *See Lozowski v. Mineta*, 292 F.3d 840, 845 (D.C. Cir. 2002) ("Because the district court entered a summary judgment, we review its decision de novo and therefore, in effect, review directly the decision of the Secretary.") Under the applicable provisions of the Administrative Procedure Act, we must determine whether the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). And, in the course of our review, "[w]e must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (inner quotations and citations omitted). Thus, "[w]e accord an agency's interpretation of its own regulations a

'high level of deference,' accepting it 'unless it is plainly wrong.'" *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1327 (D.C. Cir. 1995) (quoting *Gen. Carbon Co. v. OSHRC*, 860 F.2d 479, 483 (D.C. Cir. 1988)).

**B.   The Requirement of a "Valid Foreign Export Permit"**

Appellants challenge the decision by FWS and APHIS to detain the mahogany shipments as arbitrary and capricious, claiming that it rests on impermissible interpretations of 50 C.F.R. §§ 23.12(a) and 23.14(a).   We find no merit in this challenge.

Section 23.12(a)(3)(i) provides:

> In order to import into the United States any wild-life or plant listed in appendix III from a foreign country that has listed such animal or plan in appen-dix III, a valid foreign export permit or re-export certificate issued by such country must be obtained prior to such importation.

50 C.F.R. § 23.12(a)(3)(i).   APHIS detained the mahogany shipments at issue here, because, in its representations to FWS, "IBAMA indicated it had not determined whether the mahogany had been legally acquired, which is a prerequisite to the issuance of a CITES export permit for this species." USDA, Memorandum for the Record, January 23, 2003, at 1, J.A. 291.   This application of the regulation reflects the Government's position that a foreign export permit cannot be "valid" under CITES absent an assurance from the exporting country "that the specimen was not obtained in contravention of the laws of that State."   *See* CITES, art. V(2)(a), 27 U.S.T. at 1097.

Appellants argue that the Government's interpretation of § 23.12(a)(3)(i) is at odds with the plain text of § 23.14(a), which states:

> Only export permits, re-export certificates, certifi-cates of origin, or other certificates issued and signed by a management authority will be accepted

as a valid foreign document from a country that is a party to the Convention.

50 C.F.R. § 23.14(a). Appellants contend that, under § 23.14(a), once the Management Authority of the exporting state has issued an export permit, the permit must be accepted as "valid" by authorities in the United States. In other words, according to appellants, the plain language of § 23.14(a) precludes United States agencies from imposing other conditions precedent to the import of Appendix III species. *See* Appellants' Br. at 16. This "plain language" argument is plainly wrong.

Section 23.12(a)(3)(i) merely requires a *valid* foreign export permit, but it does not specify the conditions that a foreign export permit must meet in order for U.S. officials to regard the permit as valid, *i.e.*, to conclude that the exporting Management Authority was "satisfied that the specimen was not obtained in contravention of the laws of that State." CITES, art. V(2)(a), 27 U.S.T. at 1097. Section 23.14(a) requires that an export permit be issued and signed by the foreign Management Authority in order be accepted, but it does not say that these requirements are the only conditions that an agency may lawfully require before accepting a permit. Therefore, the language of the regulations is ambiguous as to whether U.S. officials may "look behind" a lawfully signed and issued export permit to determine whether the substantive requirements of CITES (*i.e.*, that the Management Authority was satisfied that the specimen was not obtained unlawfully) had actually been met.

The Supreme Court has held that, "[i]n situations in which 'the meaning of [regulatory] language is not free from doubt,' the reviewing court should give effect to the agency's interpretation so long as it is 'reasonable.'" *Martin v. OSHRC*, 499 U.S. 144, 150-51 (1991) (quoting *Ehlert v. United States*, 402 U.S. 99, 105 (1971)). Here, FWS and APHIS read § 23.12(a)(3)(i) as allowing U.S. officials to require more than facial satisfaction of § 23.14(a), at least in cases where the United States has reason to doubt whether the export permits in question were issued in compliance with CITES. The

regulations were promulgated pursuant to the Secretary of the Interior's clear statutory authority under the ESA to "promulgate such regulations as may be appropriate to enforce" the ESA. *See* 16 U.S.C. § 1540(f). The ESA makes it "unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of the Convention, or to possess any specimens traded contrary to the provisions of the Convention." 16 U.S.C. § 1538(c)(1). And, the stated purpose of the regulations at 50 C.F.R. pt. 23 is to "implement the Convention on International Trade in Endangered Species of Wild Fauna and Flora." 50 C.F.R. § 23.1(a).

In light of these statutory and regulatory provisions, the Government acted reasonably in requiring more than facial satisfaction of § 23.14(a) when determining whether an export permit is "valid" (*i.e.*, issued in compliance with CITES) under § 23.12(a)(3)(i). The regulations were promulgated to implement the ESA, which was itself passed, in part, to implement the Convention. The ESA specifically prohibits trade contrary to the provisions of the Convention, 16 U.S.C. § 1538(c), and provides that any specimens that are imported in violation of the ESA are subject to forfeiture to the United States, 16 U.S.C. § 1540(e)(4)(A). The Convention requires that an export permit for an Appendix III species shall only be granted when "a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora." CITES, art. V(2)(a), 27 U.S.T. at 1097.

Furthermore, Article XI provides for regular meetings of the Parties to the Convention, at which they may, *inter alia*, "make recommendations for improving the effectiveness of the present Convention." *Id.*, art. XI(3)(e), 27 U.S.T. at 1105. These recommendations, adopted through resolutions, are intended to give guidance to the Parties in implementing the Convention. Resolution 11.3 recommends that, "if an importing country has reason to believe that an Appendix ... III species is traded in contravention of the laws of any country involved in the transaction, it ... immediately inform the country whose laws were thought to have been violated."

CITES Resolution 11.3 (2000). And Resolution 12.3 recommends that "the Parties refuse to accept any permit or certificate that is invalid, including authentic documents that do not contain all the required information . . . or that contain information that brings into question the validity of the permit or certificate." CITES Resolution 12.3 § XIV(d) (2002) (repealing and incorporating CITES Resolution 10.2 § II(h) (1997)).

These provisions, taken together, make it clear that the agencies' interpretation of the applicable regulations is perfectly reasonable. It is also clear here that, to date, there are no "valid" export permits for the disputed shipments. There is no dispute that Brazil's Management Authority questioned whether the goods in the disputed shipments were obtained legally. The United States thus had a reasonable basis for inquiring further and detaining the shipments until a finding of legal acquisition could be made.

Appellants argue, and the Government does not dispute, that the CITES resolutions are merely recommendations to the Parties and, therefore, they are not binding on the United States. *See* Appellants' Br. at 22. This does not render the resolutions meaningless, however. There would be no point in the contracting states agreeing on resolutions only to then completely ignore them. Therefore, while not binding, it was surely reasonable for FWS and APHIS to look to the CITES resolutions for guidance in interpreting the regulations implementing CITES.

Furthermore, appellants' claim that they did not have notice of the Government's interpretation is meritless. It is clear from the text of the Convention that signatories may only issue export permits for Appendix III goods upon determining that they were legally obtained, so appellants can claim no surprise or confusion over this.

We also reject appellants' argument that the decision by a Brazilian federal court in *Bianchini E Serafim LTDA v. IBAMA*, Writ of Mandamus No. 2002.001437-0 (10th Fed. Dist. Ct. of Curitiba, June 28, 2002), J.A. 262-65 (trans. Berlitz GlobalNet, J.A. 253-61), compels reversal in this case.

*See* Appellants' Reply Br. at 12. The decision in *Bianchini* has no bearing on the shipments at issue in this case.

The Government acknowledges that the United States will release detained shipments when judicial review in a foreign state concludes that the goods were legally obtained, regardless of whether the foreign Management Authority disagrees with the judicial decision. There is no serious dispute over this point. Indeed, the Government followed this precept in this case in response to the *Bianchini* decision.

The Brazilian federal district court's decision in *Bianchini* upheld a mandatory injunction directing IBAMA to issue an export permit for one exporter's shipment of bigleaf mahogany. The court explained:

> It appears that the exploitation of lumber and all of the subsequent operations were made in a proper manner and authorized by the autarchy until the issuance of the challenged [moratorium], which surprised the petitioner who already had the merchandise in its warehouses and had signed contracts for export. Now, if from the time of the extraction, to the transport from Pará to this state, the merchandise had been handled properly and with the authorization of IBAMA, there could have been no grounds for suspicion that the lumber might have been extracted improperly
>
> . . .
>
> The fact that the extraction was done properly prior to suspension of the authorization for exploitation of the mahogany should not now complicate deals already signed.

*Bianchini* (trans. Berlitz GlobalNet) at 5, J.A. 256. Following this decision, IBAMA informed FWS that, pursuant to that final judicial decision, "such wood was legally acquired and must be released." Although IBAMA had appealed the *Bianchini* decision, IBAMA declared that "such appeal must not uphold (impede) its accomplishment." Letter from Mello to Thomas of 9/26/02, J.A. 281. APHIS then authorized the release of the shipment at issue in *Bianchini*. *See* Letter from James (Bud) Petit de Mange, CITES and Plant Inspec-

tion Station Coordinator, USDA, APHIS, PPQ, to Indira Singh/Martin Feinstein, PPQ of 10/10/02, J.A. 282.

However, *Bianchini* does not detract in any way from the reasonableness of APHIS's decision to detain other shipments for which no court or Management Authority has confirmed legal acquisition. *Bianchini* held that "the petitioner purchased, transported, and marketed the lumber before issuance of the restrictive regulation, in other words, with the permission previously granted by the environmental autarchy itself." *Bianchini* (trans. Berlitz GlobalNet) at 6, J.A. 257. *That holding applied only to the wood in the specific shipment at issue in that case.* The United States then released that particular shipment, even though IBAMA appealed the decision. And, while the appeal was pending, IBAMA acknowledged that the final judicial determination that the wood was legally acquired meant the wood had to be released. Therefore, neither the parties nor IBAMA dispute that a final judicial determination that the goods in a shipment were legally obtained, upon review of a Management Authority's decision to the contrary, amounts to a finding of legal acquisition as required by CITES.

It is undisputed that *Bianchini* involved a different shipment than those at issue here. In contrast to *Bianchini*, there was no final judicial disposition as to the legal acquisition of the wood in the shipments at issue in this case. For the shipments at issue here, the Brazilian court had issued *ex parte* orders requiring IBAMA to issue the export permits. *See Castlewood Prods.*, 264 F. Supp. 2d at 11. These preliminary injunctions did not purport to find that the mahogany in the shipments at issue here was legally obtained. Therefore, APHIS reasonably detained the shipments for want of assurance, either from IBAMA or pursuant to judicial decree, that the wood in the disputed shipments was legally obtained. In the absence of a valid export permit for these shipments, the Government had the authority to detain them.

### III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the District Court.